ARTHUR YOUNG & COMPANY, demandante y recurrente, *v.* VIR-
GILIO VEGA III, demandado y recurrido.

*Números:* RE-91-512 *Resueltos:* 24 de mayo de 1994
RE-91-508

*Mario Arroyo Dávila*, de *Fiddler, González y Rodríguez*, abogado de los recurrentes; *Gregory T. Usera*, de *Goldman, Antonetti, Ferraiouli & Axtmayer*, abogado del recurrido.

EL JUEZ ASOCIADO SEÑOR HERNÁNDEZ DENTON emitió la opinión del Tribunal.

Mediante una solicitud de revisión comparece ante nos Arthur Young & Company (en adelante Arthur Young) y solicita la revocación de la sentencia del Tribunal Superior, Sala de San Juan, en tanto decretó la nulidad de una cláusula del contrato de trabajo con el Sr. Virgilio Vega III que lo obligaba, durante un plazo de dos (2) años después de terminada la relación entre ambos, a no dar ni ofrecer servicios similares a los de Arthur Young a ciertos clientes de esta empresa. Por otro lado, simultáneamente recurre también el señor Vega y solicita la revocación de esta sentencia debido a que desestimó su reconvención contra Arthur Young por un despido sin justa causa en alegada violación de la Ley Núm. 80 de 30 de mayo de 1976, según enmendada, 29 L.P.R.A. sec. 185a *et seq.* Ambos recursos requieren que nos expresemos —por primera vez— acerca de la validez de las cláusulas de no competir en Puerto Rico. Luego de consolidar ambos recursos, confirmamos.

I

El 21 de enero de 1982 el Sr. Virgilio Vega III, entonces de veintiséis (26) años de edad, comenzó a trabajar como *staff accountant* en el Departamento de Auditoría de Arthur Young.(¹) Durante los tres (3) años siguientes recibió tres (3) ascensos de categoría, con tres correspondientes aumentos de salario.(²) Finalmente, el 1ro de julio de 1985,

---

(¹) En su Declaración Jurada de 19 de abril de 1990, James J. Charles, Socio Administrador de Arthur Young & Company (en adelante Arthur Young), declaró que "[e]fectivo el 1ro de octubre de 1989 Arthur Young & Co. Puerto Rico asumió los activos y los pasivos de la compañía de contadores públicos autorizados Ernst & Whinney y la nueva compañía adoptó el nombre Ernst & Young". Caso Núm. RE-91-508, Apéndice, pág. 119.

(²) El 1ro de julio de 1982 Arthur Young ascendió al señor Vega al puesto de *light senior*; el 1ro de julio de 1983 al de *senior*, y el 1ro de julio de 1984 al de *supervisor senior.* En la jerarquía de contadores de la firma, el puesto de gerente era superior a los de supervisor, *senior, light senior* y *staff accountant*, pero inferior a los de *principal* y socio.

Arthur Young le ascendió a uno de los puestos de gerente dentro del mismo departamento.(3)

Al momento de su promoción a gerente, Vega firmó un contrato de trabajo con una cláusula accesoria de no competencia que, en lo pertinente, dispone como sigue:

> You agree that you will not (1)... (2) for a period of two years after the termination of this agreement, directly or indirectly, solicit or do, without the consent of the firm, any auditing, accounting, tax or management services work for anyone who was a client of the firm and for whom you provided any service as an employee of the firm. Caso Núm. RE-91-512, Apéndice, pág. 8.

Poco más de un (1) año después, en octubre de 1986, Vega firmó otro contrato idéntico, con la única excepción de que modificó la referida cláusula.(4) La parte modificada limitaba los clientes a los cuales Vega no podría servir a quienes hubieran recibido servicios de Arthur Young durante el período de doce (12) meses anteriores a la partida del empleado, que hubieran sido atendidos por Vega durante los cinco (5) años previos:

> You agree that you will not (1)... (2) for a period of two years after the termination of this agreement, directly or indirectly, solicit or provide, without the consent of the firm, any professional service such as those provided by the firm for anyone who was a client of the firm anytime during the 12 months prior to your leaving the firm and for whom you provided any service as an employee of the firm during the prior five years.(5) Caso Núm. RE-91-512, Apéndice, pág. 8.

Como consecuencia de su ascenso a gerente, Vega recibió nuevas responsabilidades y beneficios. Entre otras cosas, Arthur Young le permitió tener acceso directo a sus

---

(3) De acuerdo con la práctica de la firma, un gerente podía permanecer en dicho puesto desde uno (1) hasta seis (6) años antes de ser ascendido a *principal*.

(4) A pesar de haberse firmado en octubre de 1986, este segundo contrato lleva fecha de 3 de julio de 1985.

(5) Esta cláusula es idéntica a una cuestionada en *Arthur Young & Company v. Galasso*, 538 N.Y.S.2d 424 (1989). El Tribunal Supremo de Nueva York concluyó que, a la luz de los criterios de la regla de razonabilidad, la cláusula era válida.

clientes y a participar activamente en la discusión y análisis de los problemas de éstos. También le delegó la responsabilidad de ejercer su propio criterio profesional en las auditorías de los clientes a su cargo.

Mientras fungió como gerente, Vega recibió dos (2) aumentos de salario, el último el 1ro de octubre de 1987. Sin embargo, en abril de 1988 Arthur Young sometió a Vega a un período probatorio de seis (6) meses por unas alegadas fallas en sus servicios a varios clientes, entre ellos, el Bufete Brown Newson & Córdova (en adelante Brown Newson).[6] Un (1) mes más tarde, Vega presentó su renuncia, efectiva el 30 de junio de 1988. Al día siguiente de la efectividad de su renuncia, abrió su propia oficina. Estos sucesos coincidieron con los esfuerzos de Brown Newson por cambiar de contador. Ya desde principios de 1988, el comité ejecutivo del bufete había decidido descontinuar su relación con Arthur Young.

Confrontado con la necesidad de un reemplazo y al enterarse de la partida de Vega, el comité ejecutivo de Brown Newson no tardó en realizar gestiones para procurar sus servicios. Varios de los abogados conocían bien los servicios que Vega le había brindado este bufete.

En la primera entrevista con el Lcdo. Jorge Souss Villalobos, socio administrador del bufete, Vega le informó que estaba impedido por contrato de solicitar trabajos a clientes de Arthur Young. Souss respondió que Brown Newson no volvería a requerir los servicios de dicha firma. Vega, quien hasta entonces no había ofrecido sus servicios al bufete, decidió presentar la propuesta que le fue solicitada. Luego de considerar a varios contadores, Brown Newson aceptó la oferta de Vega. Ambos firmaron un contrato el 6 de julio de 1988.

Así las cosas, el 3 de agosto de 1988, el bufete le solicitó a Arthur Young que entregara a Vega todos los expedientes

---

[6] Para este entonces Brown Newson & Córdova no sólo era cliente de Arthur Young, sino también su representante legal.

referentes a su contabilidad y auditoría. En lugar de acceder, Arthur Young le exigió a Vega que cumpliera con su obligación contractual y desistiera inmediatamente de dar servicios a Brown Newson. Luego de varias conversaciones, Arthur Young ofreció renunciar a cualquier derecho que pudiera tener en virtud del contrato de trabajo a cambio de la suma de cinco mil dólares ($5,000), pagadera en cuatro (4) plazos anuales.

Vega rechazó la oferta y esto propició que el 26 de septiembre de 1988 Arthur Young presentara una demanda ante el Tribunal Superior, en la cual alegó que Vega había incumplido con su contrato de trabajo al aceptar la oferta de Brown Newson. Solicitó como remedios un interdicto permanente que ordenara el cumplimiento específico del contrato y la indemnización de los daños y perjuicios resultantes del incumplimiento.

Vega contestó la demanda y alegó como defensa que la cláusula restrictiva en el presente caso contraviene el orden público, la Ley Núm. 77 de 25 de junio de 1964, según enmendada, 10 L.P.R.A. secs. 257–275, y el Art. II, Sec. 16 de la Constitución del Estado Libre Asociado de Puerto Rico, L.P.R.A., Tomo 1.[7] Además, presentó reconvención en la que alegó que su renuncia constituyó un despido sin justa causa en violación de la Ley Núm. 80, *supra*. De acuerdo con las alegaciones, la renuncia respondió a vejámenes o humillaciones públicas por parte del socio administrador de la firma, James J. Charles, dirigidas a inducirlo a renunciar.[8] Solicitó la indemnización que dispone el Art. 1 de la referida Ley Núm. 80 (29 L.P.R.A. sec. 185a).

█ Mediante sentencia sumaria notificada el 4 de junio de 1991, el Tribunal Superior decretó la nulidad de la

---

[7] Sin embargo, en su alegato Vega no repite estos argumentos ante nos, limitándose a argumentar sobre la aplicabilidad de la regla de razonabilidad del derecho común.

[8] El señor Vega también presentó una acción por despido por razón de origen nacional al amparo de la Ley Núm. 100 de 30 de junio de 1959, según enmendada, 29 L.P.R.A. secs. 146–151. Luego desistió de esta acción por falta de prueba.

cláusula del segundo contrato. Concluyó que esa cláusula era irrazonable porque sus limitaciones se extienden más allá de lo necesario para proteger los intereses de Arthur Young.[9]

El foro de instancia también desestimó la reconvención presentada por Vega. Concluyó que éste no había satisfecho el criterio enunciado en *Vélez de Reilova v. R. Palmer Bros., Inc.*, 94 D.P.R. 175, 178 (1967), al no presentar "prueba alguna que apoyara sus reclamos y que indicara la magnitud de los vejámenes y humillaciones que alega haber sufrido". Caso Núm. RE-91-508, Apéndice, pág. 22.

Inconformes, Vega y Arthur Young presentaron sendas solicitudes de revisión.

## II

Atendemos, en primer lugar, los señalamientos en torno a la validez de la cláusula de no competencia contenida en el segundo contrato entre Arthur Young y Vega. Vega alega que la cláusula de no competencia debe anularse por ser

---

[9] El tribunal de instancia concluyó que se trataba de un contrato de adhesión, por lo que lo evaluó de la forma más favorable posible para el empleado. Erró.

Hemos reconocido que el contrato de empleo es uno típico de adhesión. *Santiago v. Kodak Caribbean, Ltd.*, 129 D.P.R. 763 (1992). Sin embargo, esto no significa que estos contratos deban ser siempre interpretados liberalmente en favor de la parte más débil y mucho menos que tales pactos estén viciados de nulidad. *C.R.U.V. v. Peña Ubiles*, 95 D.P.R. 311, 314 (1967); *Casanova v. P.R.-Amer. Ins. Co.*, 106 D.P.R. 689, 697 (1978).

Sólo cuando el contrato de adhesión contiene cláusulas obscuras o ambiguas se activa la norma de interpretación del Art. 1240 de nuestro Código Civil, 31 L.P.R.A. sec. 3478, por la cual toda duda debe resolverse contra la parte que redactó el contrato. En ausencia de ambigüedad u obscuridad, el contrato debe ser interpretado según sus términos. *Casanova v. P.R.-Amer. Ins. Co.*, supra; *González v. Coop. de Seguros de Vida de P.R.*, 117 D.P.R. 659 (1986).

Ésta es la normativa aplicable tanto en Puerto Rico como en otros países civilistas. Véase J. Castán, *Derecho Civil español, común y foral*, 8va ed., Madrid, Ed. Reus, 1954, págs. 332–334, según citado en *Zequeira v. CRUV*, 83 D.P.R. 878, 882–883 (1961).

En el presente caso, la cláusula de no competencia era clara en todos sus términos y no había controversia entre las partes sobre el significado de la obligación contraída. Considerando que la controversia jurídica giraba en torno a la validez de la cláusula y no su interpretación, el foro de instancia erró al aplicar la doctrina de interpretación de los contratos de adhesión.

irrazonable y excesiva en cuanto a tiempo, servicios incluidos y clientela afectada. Aduce que la referida prohibición afecta injustificadamente al público y carece de límite geográfico. Por su parte, Arthur Young alega lo contrario.

■ Ante un asunto novel en nuestra jurisdicción como lo es la validez de las cláusulas de no competir en los contratos de empleo, las partes acuden a la regla de razonabilidad del derecho común anglosajón para apoyar sus posiciones. Véanse, *e.g.: Perry v. Moran*, 748 P.2d 224 (Wash. 1987); *Polly v. Ray D. Hilderman & Co.*, 407 N.W.2d 751 (1987). Según esta doctrina, una cláusula es razonable si protege intereses legítimos del patrono sin imponer una carga excesiva al empleado y sin perjudicar al público en general.

■ Para ser razonable, un acuerdo de no competir debe reunir los requisitos siguientes: (1) debe ser necesario para proteger un interés legítimo del patrono; (2) no debe imponer al empleado una carga demasiado onerosa, y (3) no debe afectar demasiado al público. Además, se debe considerar el área en que se le prohíbe competir al empleado, la duración de dicha restricción, el tipo de clientes que le está vedado atender, así como el tipo de servicios que se le prohíbe rendir. Se presupone, además, que el acuerdo de no competir es incidental a un contrato de trabajo, y que ha mediado causa adecuada. Véanse, *e.g.: Office Mates 5, North Shore v. Hazen*, 599 N.E.2d 1072, 1080 (1992); *Peat Marwick Main & Co. v. Haass*, 818 S.W.2d 381, 382, 386 (1991); *Holloway v. Faw, Casson & Co.*, 552 A.2d 1311, 1315 (1989); *Thompson, Breeding, et al. v. Bowlin*, 765 S.W.2d 743, 745 (1987); *Perry v. Moran*, supra, págs. 228–229; *Polly v. Ray D. Hilderman & Co.*, supra, pág. 754; *Dobbins, Deguire & Tucker v. Rutherford etc.*, 708 P.2d 577, 580 (Mont. 1985); *Singer v. Habif, Arogeti & Wynne, P.C.*, 297 S.E.2d 473, 475 (1982); *Foti v. Cook*, 263 S.E.2d 430 (1980); *Smith, Batchelder & Rugg v. Foster*, 406 A.2d 1310, 1312 (1979); *Schultz v. Ingram*, 248 S.E.2d 345, 350

(1978); *Faw, Casson & Co. v. Cranston*, 375 A.2d 463, 467 (1977); *Solari Industries, Inc. v. Malady*, 264 A.2d 53 (N.J. 1970); *Ebbeskotte v. Tyler*, 142 N.E.2d 905, 908 (1957); H. Blake, *Employee Agreements Not to Compete*, 73 Harv. L. Rev. 625, 648–690 (1960); F. Harty, *Competition between Employer and Employee: Drafting and Enforcing Restrictive Covenants en Employment Agreements*, 35 Drake L. Rev. 261, 276 (1986); *Arthur Young & Co. v. Galasso*, 538 N.Y.S.2d 424, 427 (1989); *Bland v. Henry & Peters, P.C.*, 763 S.W.2d 5, 7 (1988).

■ Numerosos tribunales de Estados Unidos han reconocido la validez de los acuerdos de no competir, según los términos de la doctrina de la razonabilidad. Estos son ampliamente utilizados por las firmas de contabilidad en Estados Unidos y se consideran válidos si cumplen con los requisitos generales de la regla mencionada. S. Pachman, *Accountants and Restrictive Covenants: the Client Commodity*, 13 Seton Hall L. Rev. 312–314 (1983).

■ De acuerdo con la regla de razonabilidad, ante un acuerdo irrazonable, existen varios cursos de acción que los tribunales en Estados Unidos han tomado. Primeramente, algunos declaran nulo el acuerdo. *Peat Marwick, Maine & Co. v. Hass*, supra, pág. 388; *Polly v. Ray D. Hilderman & Co.*, supra, pág. 755; *Cherry, Bekaert & Holland v. LaSalle*, 413 So. 2d 436, 437 (1982). Otros ordenan que se cumpla el compromiso sólo cuando resulte razonable. Para ello se ha adoptado el *blue pencil approach*, conocido también como "doctrina de separabilidad", o, como alternativa, el método de cumplimiento parcial. Mediante este método adjudicativo —hoy abandonado por la mayoría de los estados— el tribunal determina si algunas partes del acuerdo pueden eliminarse o tacharse, de modo que el acuerdo restante sea válido. El método de cumplimiento parcial requiere que el tribunal interprete razonablemente el acuerdo y ordene el cumplimiento del acuerdo según modificado. *Perry v. Moran*, supra, pág. 230; *Holloway v. Faw, Casson & Co.*, su-

pra, págs. 1325–1327; *Thompson, Breeding v. Bowlin*, supra, pág. 745. Blake, *op. cit.*, págs. 681–682; Harty, *op. cit.*, pág. 283.

Existe, además, una posición intermedia. Si a la luz de las circunstancias del caso el tribunal determina que el patrono intentó de buena fe que la restricción fuera razonable, el tribunal procede a aplicar el método de cumplimiento parcial. De otro modo, el tribunal la invalida en su totalidad. Corresponde al patrono demostrar su buena fe. *Holloway v. Faw, Casson & Co.*, supra, pág. 1327; *Smith, Batchelder & Rugg v. Foster*, supra, págs. 1311 y 1313; Blake, *op. cit.*, pág. 684.

■ Sin embargo, al analizar la aplicabilidad de la regla de razonabilidad en Puerto Rico, es menester recordar que nuestro derecho contractual se rige por los principios del derecho civil. A pesar de ser una jurisdicción civilista, no hemos dudado en anteriores ocasiones adoptar doctrinas y normas de interpretación del *common law* cuando las hemos considerado acertadas y enriquecedoras de nuestro Derecho. Sin embargo, tal adopción no puede ser indiscriminada ni irreflexiva, pues nos corresponde proteger nuestros principios y tradiciones civilistas, los cuales responden a nuestra realidad cultural e histórica. *García Cruz v. El Mundo, Inc.*, 108 D.P.R. 174, 186 (1978), opinión concurrente del Juez Asociado Señor Rigau. Con estos propósitos, examinemos los principios civilistas aplicables a la controversia de autos.

### III·

■ Comenzamos por tener presente que en nuestra jurisdicción rige el principio de la libertad de contratación.[10] Ello implica que el tipo de pactos a que

---

[10] "Los contratantes pueden establecer los pactos, cláusulas y condiciones que tengan por conveniente, siempre que no sean contrarios a las leyes, a la moral ni al orden público." Art. 1207 del Código Civil de Puerto Rico, 31 L.P.R.A. sec. 3372.

pueden llegar los contratantes está tan sólo limitado por su imaginación, siendo la voluntad de las partes la ley suprema entre ellos. Ahora bien, "[l]a libertad de contratación privada no es irrestricta". *Hernández v. Méndez & Assoc. Dev. Corp.*, 105 D.P.R. 149, 153 (1976). No podemos pasar por alto tres (3) importantes salvedades que el Art. 1207 de nuestro Código Civil, 31 L.P.R.A. sec. 3372, impone a este principio: los contratos no pueden ser contrarios a las leyes, a la moral o al orden público. *Plaza del Rey, Inc. v. Registrador*, 133 D.P.R. 188 (1993); *Casiano, Jr. v. Borintex Mfg. Corp.*, 133 D.P.R. 127 (1993); *G.E. C. & L. v. So. T. & O. Dist.*, 132 D.P.R. 808 (1993); *García v. World Wide Entmt. Co.*, 132 D.P.R. 378 (1992); *Col. Ing. Agrim. P.R. v. A.A.A.*, 131 D.P.R. 735 (1992); *Camacho Arroyo v. E.L.A.*, 131 D.P.R. 718 (1992); *Hidalgo v. Depto. Servicios Sociales*, 129 D.P.R. 605 (1991); *Unisys v. Ramallo Brothers*, 128 D.P.R. 842 (1991).

Asimismo, todo contrato debe tener como pilar principal el principio de la buena fe contractual. Desde su perfeccionamiento, el contrato obliga "no sólo al cumplimiento de lo expresamente pactado, sino también a todas las consecuencias que según su naturaleza sean conformes a la *buena fe*, al uso y a la ley". (Énfasis suplido.) Art. 1210 del Código Civil de Puerto Rico, 31 L.P.R.A. sec. 3375.[11]

La buena fe es " 'fuente de creación de especiales deberes de conducta exigibles en cada caso, de acuerdo con la naturaleza de la relación jurídica y con la finalidad perseguida por las partes a través de ella' ". M. Godreau Robles, *Lealtad y Buena Fe Contractual*, 58 Rev. Jur. U.P.R.

---

[11] La exigencia del comportamiento conforme a la buena fe es un principio rector de toda actividad jurídica y consiste en la "lealtad en el tratar, el proceder honrado y leal. Supone el guardar la fidelidad a la palabra dada y no defraudar la confianza, ni abusar de ella; supone conducirse como cabe esperar de cuantos, con pensamiento honrado, intervienen en el tráfico como contratantes". *Berríos v. U.P.R.*, 116 D.P.R. 88 (1985). Véanse: *Prods. Tommy Muñiz v. COPAN*, 113 D.P.R. 517 (1982); *Velilla v. Pueblo Supermarkets, Inc.*, 111 D.P.R. 585 (1981); *Int. General Electric v. Concrete Builders*, 104 D.P.R. 871 (1976).

367, 379 (1989), citando a L. Díez–Picazo, *Prólogo* en Wieacker, *El principio general de la buena fe* 19 (Madrid, Civitas 1982).

 El principio de buena fe contractual no es exclusivo de nuestra jurisdicción. En España, la obligación de buena fe contractual se reconoce también por vía del Art. 1258 del Código Civil español, idéntico a nuestro Art. 1210, *supra*.[12] Se ha reconocido, al amparo de este artículo, que la relación laboral está impregnada del deber de buena fe que obliga al trabajador al cumplimiento fiel de su tarea. A. Montoya Melgar, *Derecho del Trabajo*, 8va ed., Madrid, Ed. Tecnos, 1987, pág. 307. Se dice que en el trabajo hay obligaciones económicas, físicas, profesionales y morales o éticas. C. Molero Manglano, *Derecho Laboral*, Madrid, Ed. Reus, 1980, pág. 315.

 Una de las obligaciones fundamentales del trabajador, derivada de su deber de actuar conforme a la buena fe, es la fidelidad hacia su patrono. E. Pérez Botija, *Curso de Derecho del Trabajo*, 5ta ed., Madrid, Ed. Tecnos, 1957, pág. 157; Molero Manglano, *op. cit.*, pág. 320; G. Bayón Chacón, *Manual de Derecho del Trabajo*, 3ra ed., Madrid, Ed. Marcial Pons, 1962, Vol. II, pág. 487. Esta obligación, que en el derecho español está específicamente incluida en el contrato de trabajo, consiste en abstenerse de perjudicar económicamente al patrono. De este deber de fidelidad surge el de no concurrencia,[13] reconocido en el Art. 21 del Estatuto de los Trabajadores, Ley de 10 de

---

[12] "Los contratos se perfeccionan por el mero consentimiento; y desde entonces obligan, no sólo al cumplimiento de lo expresamente pactado, sino también a todas las consecuencias que según su naturaleza sean conformes a la buena fe, al uso y a la ley." Art. 1258 del Código Civil español.

[13] La concurrencia es toda actividad económica profesional para satisfacción de un interés privado a través de la cual el trabajador, *durante la relación de trabajo*, entra en competencia económica con su patrono al ofrecer al mismo círculo de clientes bienes o servicios de la misma especie y carácter. De esta forma, puede perjudicar económicamente a su patrono. C. Molero Manglano, *Derecho Laboral*, Madrid, Ed. Reus, 1990, pág. 323.

marzo de 1980, I (Anot. 607) *Aranzadi, Repertorio Crono-lógico de Legislación* 730 (1980), que dispone:([14])

Art. 21. Pacto de no concurrencia y de permanencia en la empresa.

. . . . . . . .

2. *El pacto de no competencia para después de extinguido el contrato de trabajo, que no podrá tener una duración superior a dos años para los técnicos y de seis meses para los demás tra-bajadores, sólo será válido si concurren los requisitos siguientes: a) Que el empresario tenga un efectivo interés industrial o co-mercial en ello, y b) Que se satisfaga al trabajador una compen-sación económica adecuada.*([15]) (Énfasis suplido.)

De acuerdo con lo anterior, además de permitir la cláusula de no competencia durante la relación entre el patrono y el empleado, el derecho español permite que este pacto se convierta en un *deber póstumo*, esto es, que exista aún después de extinguido el contrato laboral. Pérez Bo-tija, *op. cit.*, pág. 185. En esos casos, la validez de esa cláu-sula depende del cumplimiento de las condiciones siguien-tes: (1) el patrono debe tener un efectivo interés comercial o industrial que justifique la prohibición; (2) la restricción no debe ser ilimitada en alcance, lo cual lesionaría intole-rablemente el derecho al trabajo de los empleados; (3) el término pactado no debe exceder de dos años en cuanto a trabajadores técnicos ni seis meses sobre los demás em-pleados;([16]) (4) se debe pactar una compensación económica adecuada,([17]) y (5) debe establecerse por escrito, pues se

---

([14]) Véase, también, B. Rodríguez Santos, *Comentarios al estatuto de los traba-jadores*, 3ra ed., Valladolid, Lex Nova, 1985, Vol. 2, pág. 337.

([15]) De esta forma, el deber de buena fe y fidelidad no es meramente ético, sino que se convierte en un deber impuesto por la ley y dotado de significado patrimonial, a través de su exigencia, y protege el interés económico del empresario. E. Pérez Botija, *Curso de Derecho del Trabajo*, 5ta ed., Madrid, Ed. Tecnos, 1957, pág. 175.

([16]) En el Derecho positivo español, el actual Art. 21 proviene de los Arts. 73 y 74 de la Ley de Contrato de Trabajo de 26 de enero de 1944. Los términos allí permitidos eran dos (2) años para los trabajadores y cuatro para los técnicos. Rodríguez Santos, *op. cit.*, pág. 338.

([17]) El propósito de esta indemnización es compensar al empleado por los per-juicios causados por la inactividad a que se ve obligado por el contrato durante el tiempo que se haya pactado. No se trata de lucro cesante, sino de un daño emergente

trata de una obligación para después de extinguido el contrato de trabajo. C. Molero Manglano, *op. cit.*, pág. 322; G. Diéquez, *Lecciones de Derecho del Trabajo*, Madrid, Ed. Civitas, 1984, pág. 206; M. Gibernau, *Código Completo del Trabajo*, Barcelona, Ed. De Vecchi, 1985, pág. 116; A. Montoya Melgar, *op. cit.*, pág. 311; E. Ortega Prieto, *El Estatuto de los Trabajadores*, 2da ed., Bilbao, Ed. Deusto, 1985, pág. 110; F. Somoza Albardonedo, *El Estatuto de los Trabajadores*, Madrid, Servicio de Publicaciones del Ministerio de Trabajo y Seguridad Social, 1987, págs. 136–137.

■ Aunque la cláusula de no competencia sea válida, el trabajador puede quedar liberado de su obligación negativa: (1) por autorización del empresario; (2) cuando éste incumple ciertas condiciones, y (3) si no demuestra la realidad del perjuicio sufrido por la empresa. Bayón Chacón, *op. cit.*, pág. 487.

■ Por otro lado, la doctrina argentina, que también reconoce el deber de fidelidad del empleado,[18] señala que las cláusulas de no competencia para después de terminada la relación de trabajo sólo deben aplicarse a aquellos empleados capaces de competir efectivamente y que pueden hacerlo en el futuro debido a su posición en la empresa. Además, la prohibición no puede extenderse, en cuanto a objeto, lugar y tiempo, más allá de lo que fuera necesario para proteger los intereses legítimos del antiguo patrono.[19]

---

por la pérdida efectiva por no devengar su salario durante la inactividad. G. Diéquez, *Lecciones de Derecho del Trabajo*, Madrid, Ed. Civitas, 1984, pág. 206.

[18] Arts. 85 y 88 del Código del Trabajo Anotado, 7ma ed., Buenos Aires, Eds. Depalma, 1986, págs. 102 y 103; G. Cabanellas, *Tratado de derecho laboral-contrato de trabajo*, Buenos Aires, Ed. El Gráfico, 1949, T. II, pág. 423 y ss.; E. Krotoschin, *Tratado práctico de derecho del trabajo*, Buenos Aires, Ed. DePalma, 1955, Vol. 1, pág. 209 y ss.

[19] "Para que ello ocurra, se precisa siempre un convenio especial entre las partes. Estos convenios están subordinados a las reglas generales del derecho común, aunque deben ser juzgados e interpretados de acuerdo con los propósitos del derecho del trabajo, teniendo en cuenta la protección del trabajador dependiente. Por eso, las cláusulas de interdicción de competencia, con efecto posterior a la terminación del contrato, sólo pueden reconocerse como válidas dentro de ciertos límites."

Además de las condiciones impuestas por los ordenamientos jurídicos de España y Argentina, Bélgica toma como punto de partida para determinar la validez de las cláusulas de no competencia la remuneración anual del empleado. Si ésta es menor a los doscientos cincuenta mil (250,000) francos (siete mil doscientos cuatro dólares ($7,204)), el contrato es inexistente; entre doscientos cincuenta mil (250,000) y quinientos mil (500,000) francos (siete mil doscientos cuatro dólares ($7,204) a catorce mil cuatrocientos siete dólares ($14,407)), sólo es válido en cuanto a ciertas funciones especificadas por convenio colectivo; mayor de quinientos mil (500,000) francos (catorce mil cuatrocientos siete dólares ($14,407)), la cláusula es válida para cualquier función, excepto aquellas expresamente excluidas por convenio. Ley de 3 de julio de 1978, Relativa a los contratos de Trabajo, según citada en B. Rodríguez Santos, *op. cit.*, págs. 340–341 esc. 15.

También se especifica que la restricción debe limitarse a actividades similares a las del patrono, a un área geográfica en que pueda haber competencia real, y a un término no mayor de doce (12) meses. El estatuto de Bélgica también ordena el pago de una indemnización igual a la mitad del sueldo del empleado correspondiente al término de prohibición. Por último, declara la inefectividad del contrato si se finaliza la relación durante el período de prueba, o después, si es por iniciativa del patrono sin justa causa, o a iniciativa del empleado por justa causa. Rodríguez Santos, *op. cit.*

De la exposición anterior se desprende que en los países de tradición civilista, las cláusulas de no competencia no son inválidas per se, por el contrario, se les reconoce como un derivado del deber de la buena fe del empleado y su correspondiente obligación de actuar fielmente respecto a su patrono. Ahora bien, de la misma forma el patrono

Krotoschin, *supra*, pág. 215 n. 36.

está obligado por la buena fe contractual a no imponer restricciones que excedan su verdadera necesidad de protección contra la no competencia. Los ordenamientos jurídicos antes descritos protegen a los empleados contra ese peligro y la consiguiente restricción a su derecho al trabajo, imponiendo ciertas condiciones que, de no cumplirse, invalidan el pacto de no competencia.

■■■ Examinada la normativa civilista descrita anteriormente, y considerando que en nuestro ordenamiento rige el principio de la libertad de contratación, como regla general los acuerdos de no competencia son válidos. Sin embargo, considerando que todo contrato debe estar conforme al principio de la buena fe, en ausencia de expresión legislativa al respecto, la validez de las cláusulas de no competencia dependerá del cumplimiento de las condiciones siguientes.

Primero, el patrono debe tener un interés legítimo en dicho acuerdo, esto es, que de no recibir la protección de una cláusula de no competencia, su negocio se vería sustancialmente afectado. La magnitud de este interés se medirá, entre otras cosas, a la luz de la posición del empleado dentro de la empresa. Esto es, que la existencia del interés del patrono estará directamente relacionada y dependerá de que el empleado, por la posición que asume en la empresa, esté facultado para competir de forma efectiva con su patrono en un futuro.

Segundo, el alcance de la prohibición debe corresponder con el interés del patrono, en cuanto a objeto, término y lugar de restricción o clientes afectados. El objeto de la prohibición se debe limitar a actividades similares a las efectuadas por el patrono; no es necesario que se limite a las funciones específicas del empleado. El término de no competencia no debe excederse de doce (12) meses, entendiéndose que cualquier tiempo adicional es excesivo e innecesario para proteger adecuadamente al patrono. Por último, respecto al alcance de la prohibición, el contrato debe

especificar los límites geográficos o los clientes afectados. En cuanto al área geográfica a la que aplica la restricción, ésta debe limitarse a la estrictamente necesaria para evitar la competencia real entre el patrono y el empleado. Cuando la prohibición de competencia se refiere a los clientes, debe referirse sólo a aquellos que el empleado atendió personalmente durante un período razonable de tiempo antes de renunciar o en un período inmediatamente anterior a la renuncia, y que al hacerlo todavía eran clientes del patrono. Estos elementos se evaluarán teniendo en mente la naturaleza de la industria involucrada y el posible interés público relacionado.

Tercero, el patrono debe ofrecer una contraprestación a cambio de la firma del acuerdo de no competir por parte del empleado. Esta contraprestación puede consistir, por ejemplo, en la obtención de un ascenso, de beneficios adicionales en el trabajo o del disfrute de cambios sustanciales de similar naturaleza en las condiciones de empleo. Incluso sería suficiente que un candidato obtenga el empleo deseado en la empresa. Sin embargo, no se admitirá como causa del acuerdo de no competencia la mera permanencia en el empleo.

Cuarto, los pactos de no competencia, como todo contrato, deben contar con los elementos esenciales para su validez: consentimiento, objeto y causa. Art. 1213 del Código Civil, 31 L.P.R.A. sec. 3391. Sin embargo, en este tipo de contratos seremos especialmente estrictos al asegurarnos de que el empleado firmó libre y voluntariamente el contrato de no competencia. No permitiremos coacción o presión indebida alguna por parte del patrono. Nada se ha alegado en el caso de marras que nos permita inferir que hubo tal coacción o presión indebida. Esta consideración, sin embargo, es innecesaria a la luz de lo que resolvemos a continuación sobre la validez del contrato.

Finalmente, es indispensable que los pactos de no competencia consten por escrito.

 En la medida en que estos contratos incumplan con las condiciones anteriores, se considerarán, además de contrarios a la buena fe contractual, violadores del orden público[20] por restringir de forma excesiva e injustificada la libertad de trabajo del empleado y la libertad de selección del público en general. Por tal razón, en vez de modificar la voluntad de las partes para ajustarla a normas razonables, se declarará nulo todo pacto de no competir que no cumpla con las condiciones anteriores.

## IV

Apliquemos ahora los criterios anteriores al caso de autos. Comencemos por evaluar el interés del patrono.

Tratándose de una industria de servicios como lo es la contabilidad pública, la clientela es indispensable para la subsistencia de una oficina de contabilidad. Por esta razón, el patrono tiene un interés legítimo en protegerse contra la competencia de un antiguo empleado. S.E. Steinle, *The Permissible Scope of Employment Non–Competition Agreements: Important Considerations for CPAs and CPA/Employers*, Kan. C.P.A. Newsl. 5 (1992).

 Para comprender mejor este interés del patrono y la vulnerable posición en que se encuentra, por la especial relación de su empleado con el cliente, es necesario comprender la naturaleza de los servicios que un contador público autorizado ofrece. El contador público autorizado

---

[20] El orden público "es el conjunto de valores eminentes que guían la existencia y bienestar de una sociedad. El concepto orden público recoge y ampara un interés social dominante por su trascendencia, por el número de personas que afecta y por la valía de los derechos que tiende a proteger. En gran medida el orden público es acopio de normas de moral y de ética pública que en ocasiones alcanzan su exposición en ley, pero que aun sin esa expresa declaración legislativa, constituyen principios rectores de sabio gobierno nacidos de la civilización y fortalecidos por la cultura, la costumbre, por la manera de ser, en fin por el estilo de una sociedad. Castán ve tanto en la costumbre como en la ley el modo de manifestación de la voluntad social predominante". (Citas omitidas.) *Hernández v. Méndez & Assoc. Dev. Corp.*, 105 D.P.R. 149, 153 (1976). Véase *Camacho Arroyo v. E.L.A.*, 131 D.P.R. 718 (1992).

realiza tres (3) funciones principales: auditoría o intervención de cuentas, asesoría contributiva y asesoría gerencial o financiera.[21]

■ Como auditor, este profesional debe determinar, previo análisis de los libros y registros de la empresa, si los estados financieros de la entidad reflejan razonablemente su situación financiera y sus resultados operacionales. C.E. Díaz Olivo, *El privilegio contador-cliente, ¿un super privilegio?*, 58 Rev. Jur. U.P.R. 77, 83 (1989).

El contador que actúa como asesor contributivo de su cliente le orienta sobre el impacto contributivo de sus transacciones. También le ayuda en la preparación de las planillas contributivas y lo representa en los procedimientos administrativos en el Departamento de Hacienda, en el Servicio de Rentas Internas federal, o en procedimientos judiciales en el Tribunal Federal de Contribuciones. Díaz Olivo, *supra*, págs. 83 y 88.[22]

Como consultor gerencial o financiero, el contador evalúa la política sobre inventarios de la empresa, diseña e implementa sistemas de contabilidad y de procesamiento de información, prepara presupuestos, y orienta sobre el manejo de personal y planificación financiera, entre otras labores.

Dentro de esta relación profesional, el contador tiene acceso ilimitado a los libros, a los registros, a las facturas y a los demás documentos del cliente. Así adquiere conocimiento de detalles sensitivos del negocio de su cliente.[23]

---

[21] Otras funciones son: planificación financiera de individuos, asesoría a instituciones gubernamentales y a asociaciones sin fines de lucro, educación, y orientación a la comunidad. Véanse las siguientes publicaciones del Colegio de Contadores Públicos Autorizados de Puerto Rico: *El CPA: asesor para los pequeños negocios; The CPA as Personal Financial Planner; The CPA as Management Consultant.* Véase, también, American Institute of Certified Public Accountants, *What Does a CPA Do?*, 1986.

[22] Regla 2 de Práctica y Procedimiento del Tribunal de Contribuciones de Estados Unidos, 26 U.S.C. Ap.

[23] "No es extraño que un contador se entere de fórmulas comerciales confidenciales, planes, estrategias y diseños futuros, costos de producción, listados de clien-

De lo anterior se desprende que la relación entre el contador público autorizado (sea éste empleado de una firma o dueño de su propio negocio) y su cliente requiere contacto personal frecuente y una estrecha confianza. Se trata, pues, de una relación profesional de naturaleza fiduciaria. *Mailman, Ross, etc. v. Edelson*, 444 A.2d 75, 80 (1982).

De esta forma, el contador público autorizado se encuentra en una posición privilegiada. Tiene completo acceso a la información sobre los clientes del patrono, establece contacto personal y se da a conocer profesionalmente entre éstos. Esta ventaja existe principalmente cuando el contador público autorizado ha alcanzado una jerarquía dentro de la firma que le permite atender personalmente a los clientes.

Evaluados los contratos suscritos por las partes y las tareas realizadas por Vega, no hay duda de que Vega, en este caso, al ocupar la posición de gerente gozaba de las anteriormente mencionadas ventajas.

En estas circunstancias, la firma demandante está en una posición especialmente vulnerable a la pérdida de clientes. Es razonable pensar que un cliente que ha confiado sus secretos y ha recibido asesoría de un contador público autorizado prefiera seguirlo cuando éste abandone a su patrono. Esto, especialmente, si prevé una disminución en el costo por el mismo servicio.[24]

---

tes, tensiones y conflictos internos, administración ineficiente, violaciones de ley, fusiones o compras de negocios contempladas, entre otras cosas. Mucha de esta información no tiene relación ni es pertinente en ocasiones a la labor específica que en esos momentos realiza el contador. Sin embargo, puede ser vital a la propia existencia de la empresa." C.E. Díaz Olivo, *El privilegio contador-cliente, ¿un super privilegio?*, 58 (Núm. 1) Rev. Jur. U.P.R. 77, 87 (1989).

[24] La cláusula de no competencia es un método eficaz de protección al patrono en la industria de la contabilidad pública. Evita que, para proteger su clientela, el patrono tenga que rotar a los contadores empleados para que ninguno establezca la estrecha relación de confianza que llevaría al cliente a abandonar la firma. También evita que el patrono opte por limitar todo contacto con clientes a ciertas personas de la firma. Estas alternativas perjudicarían el interés público, pues evitarían el surgimiento de la relación de confianza que nuestro ordenamiento pretende fomentar. Además, estas alternativas son ineficientes, pues evitan que un contador público autorizado adquiera el conocimiento pleno de las actividades del cliente, tan necesa-

Reconocido el interés del patrono en esta industria, debemos analizar si el alcance de la cláusula en cuestión se limita estrictamente a proteger ese derecho o si resulta excesiva de forma que se afecte irrazonablemente el interés público y el derecho al trabajo de Virgilio Vega, aquí demandado.

Al evaluar el interés público en este contexto, es necesario puntualizar que debido a la naturaleza de la relación entre el contador público autorizado y su cliente —tan similar a la existente entre el abogado y su cliente— es aconsejable proteger la libertad del público para escoger al profesional de su confianza.

> Accountants are not commercial business people like the salespersons restricted by noncompetition agreements in *Solari* and *Whitmyer.* Accountants, like doctors and lawyers, are engaged in a profession which necessarily requires clients to reveal personal and confidential information to them in the course of the professional relationship. Like the lawyer-client relationship characterized in *Dwyer*, the accountant-client relationship is also consensual and fiduciary, and the right of the client to repose confidence in the accountant of his or her choice should not readily be circumscribed. .... The clients' right to select the custodians of their financial affairs is paramount, and may not be unreasonably encumbered. *Mailman, Ross, etc. v. Edelson*, supra, pág. 80. Véase, también, *Holloway v. Faw, Casson & Co.*, 552 A.2d 1311 (1989).[25]

Esta libertad de selección fomenta la confianza entre el profesional y su cliente y, por ende, facilita el libre flujo de información entre ellos.[26] No podemos olvidar que nuestro

---

rio para prestar un servicio de excelencia.

[25] En *Racine v. Bender*, 252 P. 115, 117 (1927), el tribunal concluyó: "They [the clients] do not desire his services because he is the only person who has the ability to perform them, but because they know him well, and he knows all about their business."

[26] Esto no sólo beneficia a las partes involucradas, sino también al interés público que permea la función social de esa profesión. La necesidad de un libre y amplio flujo de información entre el contador y su cliente es indispensable en todas sus facetas. Como auditor, si el cliente oculta información, existe el peligro de que el profesional no lo detecte, pues en su intervención examina solamente una muestra de las transacciones de la empresa auditada. De esta forma, el descubrimiento de errores e irregularidades muchas veces depende de la candidez del cliente hacia su

ordenamiento ha reconocido la importancia de fomentar esta relación al conceder un privilegio mediante la Ley de Contabilidad Pública de Puerto Rico, Ley Núm. 293 de 15 de mayo de 1945 (20 L.P.R.A. secs. 77–790), por el cual "[n]inguna corte exigirá a ningún contador público autorizado o contador público que divulgue información o evidencia obtenida por él en su carácter confidencial como tal". 20 L.P.R.A. sec. 790.[27]

Con estos intereses en mente, pasemos a evaluar el alcance de la restricción impuesta en el contrato entre Arthur Young y Vega.

## V

De entrada podemos concluir que el contrato de no competencia firmado entre Arthur Young y Vega es válido en cuanto a las funciones prohibidas y la clientela afectada. Se limita a los servicios provistos por Arthur Young, de forma que Vega podría en teoría ofrecer otro tipo de servicios profesionales a los clientes de la firma demandante. Por otro lado, los clientes afectados de acuerdo con el contrato son aquellos a los que Vega rindió servicios durante los cinco (5) años anteriores a su renuncia y que continuaban como clientes de la demandante durante los doce (12) meses previos a la partida del demandado. Esta limitación no es excesiva, pues se refiere únicamente a los clientes que tuvieron contacto real con Vega y, por ende, susceptibles de ser influenciados por éste para abandonar a la firma demandante. Además, el señor Vega no alegó que al firmar el contrato lo hiciera debido a presión indebida o coacción por parte de Arthur Young.

---

contador público autorizado. Díaz Olivo, *supra*, pág. 86. La necesidad de confianza plena en la relación es patente también en sus facetas de asesoría contributiva, gerencial y financiera. En éstas el contador es representante de su cliente y la eficiencia y efectividad de su trabajo depende del adecuado conocimiento de los hechos y de las transacciones del cliente. Íd.

[27] Para un excelente análisis sobre este privilegio, véase Díaz Olivo, *supra*.

Por otro lado, en este caso Vega recibió una contraprestación adecuada a cambio de firmar el contrato de no competencia, pues fue ascendido al puesto de gerente en la firma.

Sin embargo, el contrato de marras de no competir es excesivo en cuanto al término de prohibición, pues impide a Vega atender a los clientes de Arthur Young durante dos (2) años desde su partida de la firma. Los intereses legítimos de Arthur Young no justifican una prohibición tan extensa en tiempo, máxime cuando generalmente los servicios de auditoría y asesoría contributiva se proveen anualmente, en intervalos menores de tiempo o de forma continua. Se ha reconocido, incluso, que una firma de contabilidad es capaz de sustituir a un contador público autorizado, de forma que el nuevo empleado adquiere conocimiento pleno del cliente en seis (6) semanas. Pachman, *supra*, pág. 315; *Wolf & Co. v. Waldron*, 366 N.E.2d 603, 605 (1977). Aun así, consideramos que el recuperar la confianza del cliente podría tomar hasta un (1) año, término que hemos considerado razonable en los contratos de no competencia en Puerto Rico.

Después que un cliente ha tenido que ajustarse a un nuevo contador público autorizado durante un (1) año o más —sea de la misma o de otra oficina de contabilidad— un regreso al profesional que abandonó la firma no debe estar relacionado con la posible influencia que éste ejerció para ello mientras trabajaba allí. Por el contrario, lo lógico es pensar que el cliente busca la eficiencia y competencia profesional de ese contador público en específico. Consideramos que el patrono no tiene un interés legítimo en limitar hasta tal punto la libertad de selección del cliente.

Por ende, el contrato suscrito por las partes en este caso protege de forma excesiva a Arthur Young, afectando así innecesariamente el interés de Virgilio Vega en trabajar y el de los clientes en escoger libremente al profesional de su confianza. Resolvemos, pues, que esta cláusula de no com-

petencia es ineficaz y nula por contravenir el orden público y la buena fe contractual.[28]

Por lo tanto, procede confirmar la sentencia recurrida en cuanto anuló el contrato de marras.

## VI

Atendemos, en segundo lugar, los señalamientos en torno a la desestimación de la acción de Vega contra Arthur Young por un alegado despido sin justa causa en violación de la Ley Núm. 80, *supra*. Sabido es que, según el Art. 1 de la referida Ley Núm. 80, todo empleado contratado, sin tiempo determinado, que fuere despedido sin justa causa tiene derecho a recibir de su patrono la indemnización que allí se dispone. La ley define el término "despido" no sólo como la cesantía expresa del empleado, sino también como su despido implícito. Citamos la parte pertinente de su Art. 5:

> A los efectos de esta ley se entenderá por despido ... la renuncia del empleado motivada por actuaciones del patrono dirigidas a inducirlo a renunciar tales como imponerle o intentar imponerle condiciones de trabajo más onerosas, reducirle el salario, rebajarlo en categoría o someterlo a vejámenes o humillaciones de hecho o de palabra. 29 L.P.R.A. sec. 185e.

En *Vélez de Reilova v. R. Palmer Bros., Inc.*, supra, pág. 179, establecimos que para que los actos voluntarios e injustificados del patrono constituyan un despido implícito para fines de la Ley Núm. 80, *supra*, es preciso que el empleado pruebe que la única alternativa razonable que le quedaba era el abandono de su cargo.

En su reconvención, Vega sostuvo que su renuncia constituyó un despido implícito sin justa causa, ya que respondió a alegados vejámenes y humillaciones públicas que le

---

[28] Por nuestra conclusión de considerar que la cláusula de no competencia en este caso no tiene validez, no es necesario evaluar si se ocasionaron daños por el incumplimiento alegado por Arthur Young.

profirió el socio administrador de Arthur Young, James J. Charles. Para que procediera la acción, Vega debía demostrar que los vejámenes y las humillaciones fueron tales que el único curso de acción razonable era renunciar a su puesto como gerente.

Luego de estudiar detenidamente la solicitud de sentencia sumaria de Arthur Young, la oposición de Vega y los documentos anexados a éstas, concluimos que el magistrado de instancia obró conforme a derecho al desestimar la reconvención. Coincidimos con su apreciación en cuanto a que las declaraciones incontrovertidas de la deposición de Vega no demuestran la magnitud de los alegados vejámenes ni que la única alternativa razonable a su disposición era renunciar.[29]

Tal como señala la sentencia recurrida, Vega falló en sustentar cada uno de los alegados incidentes. Con excepción de un comentario acerca de compartir los secretos del negocio con su cónyuge, Vega "no recordó fechas, lugares, palabras, comentarios, personas o demás circunstancias que rodearon todas las circunstancias en que alegadamente [sic] se le vejó". Caso Núm. RE-91-508, Apéndice, pág. 21. En vista de esta deficiencia, procedía concluir que Vega no logró satisfacer el criterio enunciado en *Vélez de Reilova v. R. Palmer Bros., Inc.*, supra.

## VII

En resumen, confirmamos el decreto de nulidad de la cláusula de no competencia contenida en el segundo contrato entre Arthur Young y Vega. Confirmamos también la desestimación de la reconvención presentada por Vega por entender que éste no logró establecer la procedencia de

---

[29] Arthur Young acompañó su solicitud de sentencia sumaria con varios documentos, entre ellos, la parte de la deposición de Vega que se refería a los alegados incidentes en que James J. Charles le vejó o humilló públicamente. Vega, por su parte, no anexó a su oposición documento alguno que complementara con detalles sus declaraciones en la deposición.

una acción por despido implícito sin justa causa de acuerdo con la Ley Núm. 80, *supra*, y la jurisprudencia pertinente.

*Procederemos a dictar la sentencia correspondiente.*

El Juez Asociado Señor Fuster Berlingeri emitió una opinión concurrente. El Juez Presidente Señor Andréu García disintió sin opinión escrita. El Juez Asociado Señor Negrón García se inhibió.

— O —

Opinión concurrente emitida por el Juez Asociado Señor Fuster Berlingeri.

Estoy de acuerdo con el resultado al que llega la mayoría en este caso. Coincido en que la cláusula de no competencia, aquí impugnada, es ineficaz y nula por contravenir el orden público y la buena fe contractual.

Sin embargo, no puedo suscribir varios de los pronunciamientos normativos formulados por la mayoría en su opinión, por las razones que explico más adelante.

I

Aunque la mayoría invalida el particular pacto de no competir del caso ante nos, a la vez resuelve que, como regla general, los acuerdos de no competencia son válidos. A mi modo de verlo, esta esencial determinación normativa es desacertada. A la inversa de lo que resuelve la mayoría, creo que los pactos de no competir como el que tenemos ante nuestra consideración aquí *deben verse siempre con extremo recelo, en términos jurídicos. Prima facie, deben considerarse como pactos ineficaces*, cuya validez está sujeta a que quien los invoque está en la obligación de justificarlos. Ello es así por varias razones fundamentales no valoradas por la mayoría en su opinión. Veamos.

A. En primer lugar, los pactos en cuestión son eviden-
temente *contratos de adhesión*, en los cuales sólo una de
las partes dicta las condiciones que ha de aceptar la otra.
En estos contratos, el empleado tiene que aceptar de ordi-
nario lo que propone el patrono, porque dicho empleado no
está en posición de exigir mejores términos. "Sabido es que
el contrato de adhesión presenta el fenómeno de una re-
ducción al mínimo de la bilateralidad contractual." *Ze-
queira v. CRUV*, 83 D.P.R. 878, 881 (1961).

En la doctrina civilista, como en nuestra propia juris-
prudencia, los contratos de adhesión son tratados jurídica-
mente de modo excepcional. No se les da enteramente la
eficacia que se le reconoce de ordinario a otros contratos
porque prevalece la norma en cuanto a que sus cláusulas
deben interpretarse liberalmente a favor de la parte con-
tratante más débil en el aspecto económico, que en este
caso es el empleado. *Santiago v. Kodak Caribbean, Ltd.*,
129 D.P.R. 763 (1992). Castán lo explica así:

> Viene ligada esta especie de contratos al fenómeno económico
> de la posición privilegiada que, por diversos motivos (por ejem-
> plo, para poderse ejercitar un monopolio de derecho o de hecho),
> tiene una de las partes respecto de la otra. En este sentido,
> define Messineo al contrato de adhesión como aquel en que se
> actúa, por parte del contrayente económicamente más fuerte, la
> imposición de determinadas cláusulas o del completo esquema
> del contrato, en sentido ventajoso para él y en detrimento del
> otro contrayente, el cual, siendo económicamente más débil, no
> tiene libertad de escoger, sino entre aceptar aquellas cláusulas
> o aquel esquema, o renunciar a la celebración del contrato.
>
> . . . . . . . .
>
> Con respecto a tales contratos, que han provocado una ex-
> tensa literatura, se ha discutido especialmente el problema de
> su naturaleza jurídica y el de sus efectos e interpretación.
>
> En orden a la naturaleza, ha habido dudas sobre si el con-
> trato de adhesión representa un verdadero contrato o más bien
> un acto unilateral....
>
> En orden a los efectos trátase de determinar —toda vez que
> son notorios los graves peligros que ... traen consigo para el
> público los contratos de adhesión— qué medidas de prevención
> o reacción jurídica, legislativa o judicial, podrán evitar las ini-

quidades a que se presta esta especie de contratos, asegurando el equilibrio contractual que la hegemonía económica de las grandes empresas tiende a destruir.

Las legislaciones modernas nos dan ya empleo de esa intervención legislativa dictando disposiciones generales que limitan la eficacia de las cláusulas preestablecidas unilateralmente por las empresas (v. arts. 1,341 y 1,342 del nuevo Código Civil italiano)....

. . . . . . . .

... Se ha sostenido que en tales contratos el juez tiene un poder excepcional de interpretación que le autoriza para no aplicar las cláusulas del contrato más que en consideración de la situación particular de las partes, e incluso un poder de revisión que le autorizaría a modificar el contrato en la parte que apareciera como injusta...". J. Castán, *Derecho Civil español, común y foral*, 8va ed., Madrid, Ed. Reus, 1954, Vol. 3, págs. 332–334.

En nuestra jurisprudencia hemos interpretado el Art. 1240 del Código Civil, 31 L.P.R.A. sec. 3478, que dispone que las cláusulas oscuras de un contrato no deben favorecer al que ocasionó la oscuridad, *con especial rigor* cuando se trata de contratos de adhesión. Claró está, el carácter poco favorecido de estos contratos, según se describe en la anterior cita de Castán, va más allá del problema de las cláusulas oscuras. Hemos adaptado en Puerto Rico este importante concepto normativo, aun cuando el problema ante nos no era uno de cláusulas oscuras. Véanse: *Maryland Casualty Co. v. San Juan Racing Assoc., Inc.*, 83 D.P.R. 559 (1961); *C.R.U.V. v. Peña Ubiles*, 95 D.P.R. 311 (1967).

Conforme a su naturaleza como contrato de adhesión, los pactos en cuestión no deben convalidarse si no surge *claramente* que el empleado recibió *una contraprestación particular adecuada* a cambio de acceder al acuerdo de no competir. Es decir, debe existir *causa adecuada* respecto a dicho acuerdo para que éste sea válido. Ese es el tenor de la doctrina civilista sobre el particular, que la mayoría cita en su opinión, aunque luego no la aplica de modo cabal. Como bien señala la mayoría en el esc. 17, citando a Gonzalo Diéguez, quien explica por qué el patrono debe otorgar

una compensación económica adecuada al empleado a cambio del pacto de no competir:

> El propósito de esta indemnización es compensar al empleado por los perjuicios causados por la inactividad a que se verá obligado por el contrato durante el tiempo que se haya pactado. No se trata de lucro cesante, sino de un daño emergente por la pérdida efectiva, por no devengar su salario durante la inactividad. G. Diéguez, *Lecciones de Derecho del Trabajo*, Madrid, Ed. Civitas, 1984, pág. 206.

Si no se compensa al empleado por separado y adecuadamente por convenir en no competir, el contrato de adhesión, además de injusto, es susceptible a ser atacado por falta de una causa válida. Nuestro Código Civil dispone expresamente en su Art. 1227 (31 L.P.R.A. sec. 3432) que es ilícita la causa de un contrato si se opone a la moral. Interpretando esa disposición ya hemos resuelto que el concepto de "causa ilícita" no sólo se refiere "a la vertiente objetiva que visualiza sólo el contenido de las contraprestaciones" del contrato, sino también a "los motivos o móviles que indujeron a las partes a contratar". *Reyes v. Jusino*, 116 D.P.R. 275, 282 (1985). Véase *Sánchez Rodríguez v. López Jiménez*, 116 D.P.R. 172 (1985). Como la doctrina moderna admite que al estimar, si existe causa lícita, se consideren los motivos que permearon la contratación, si en un contrato de adhesión, como el de marras, no se compensó al empleado en particular por haber acordado no competir y éste sólo aceptó dicho acuerdo constreñidamente porque de otro modo no obtendría el empleo, el pacto debe estimarse como carente de causa lícita. Sólo así se salvaría la evidente inequidad que apareja este contrato de adhesión.

En el caso ante nos, no medió causa adecuada para el pacto de no competir. La mayoría interpreta acomodaticiamente que un ascenso en rango obtenido por el recurrido fue prestación suficiente para el contrato de no pacto de este caso. Pero dicho ascenso fue resultado más bien de la antigüedad del recurrido en su empleo y de sus buenos

servicios previos al patrono. Nótese, además, que en el primer contrato de no pacto involucrado aquí no hubo causa alguna. No tiene razón la mayoría.

B. Una segunda razón fundamental —para tratar los pactos laborales de no competir con recelo jurídico— se encuentra en la concepción contemporánea del trabajo, que está encarnada en nuestra Constitución y que forma parte de la moral pública de nuestra época.

Como se sabe, en la primera mitad del siglo XIX se difundió a través de las sociedades capitalistas una concepción que entendía el trabajo humano como una especie de mercancía que el trabajador vendía al empresario, dueño del capital, al precio que el mercado fijase, fuese o no adecuado. Hoy día, en cambio, prevalece un modo más sensible de concebir y valorar el trabajo. Se piensa que es un *bonum orduum*, un bien de la humanidad, que corresponde a la dignidad del ser humano y que a su vez lo ennoblece. Con arreglo a esta concepción, el trabajo tiene un hondo significado ético porque mediante éste la persona aporta al bien común y se autorealiza. No se trata, pues, solamente de un medio de subsistir, sino además del instrumento en virtud del cual se forma la vida familiar, se proporciona algún bien o servicio a otros, a la vez que se propicia que la persona actualice su potencial humano y se haga más persona. Es por ello, en parte, que nuestra Constitución reconoce varios derechos fundamentales al trabajador, entre ellos el de escoger su ocupación libremente.

La idea de obligar a un trabajador a convenir a no competir como condición para obtener un empleo no es compatible con la concepción del trabajo antes aludida. Es más afín con las nociones decimonónicas que la humanidad ha dejado atrás. El pacto de no competir que se le impone al empleado es una onerosa carga a su futura libertad ocupacional y una limitación grave a su cabal desenvolvimiento como persona productiva. Constituye una exigencia opresiva y denigrante como condición para obtener o conservar

el empleo actual. Por ello, al ponderar si los pactos en cuestión son consistentes con la moral pública, como exige el Art. 1207 de nuestro Código Civil, 31 L.P.R.A. sec. 3372, debemos concluir que los mismos no están a la altura de nuestros tiempos y debemos por ello tratarlos con suspicacia jurídica.

C. Resulta cuando menos irónico que en una sociedad de mercado como la nuestra, donde se preconiza la libre competencia y en la cual se prohíben por ley las prácticas monopolísticas y los acuerdos para restringir los negocios y el comercio, se pretenda convalidar un género de pactos que persiguen precisamente evitar la competencia. Sostener la validez de tales pactos parecería ser contrario al entramado de valores y principios sobre los cuales se erige el sistema económico de libre empresa, que persigue el bienestar del público en general permitiendo la competencia vigorosa entre los que producen bienes y servicios. Según la teoría económica que el sistema encarna, esa competencia vigorosa asegura que el consumidor tendrá acceso a servicios adecuados con precios razonables. La prohibición de la competencia, en cambio, encarece los servicios y limita la libertad del consumidor de escoger quién se los ha de proveer.

La contradicción entre el pacto de no competir y los postulados económicos y jurídicos de una sociedad de mercado libre explica por qué en Estados Unidos, de donde copiamos nuestro régimen, el propio Instituto Americano de Contadores Públicos Autorizados *se opone* a los contratos de no competencia. *Smith, Batchelder & Rugg v. Foster*, 406 A.2d 1310 (1979). Explica, además, por qué en Estados Unidos aun los que apoyan tales pactos los conciben de manera muy limitada y no creen justificado que éstos tengan una duración mayor que el tiempo necesario para que el patrono obtenga y adiestre un nuevo empleado para sustituir al que dejó la empresa. H. Blake, *Employee Agreements Not to Compete*, 73 Harv. L. Rev. 625, 677–678

(1960). Es decir, aun los que apoyan tales pactos tienden a concebir el interés del patrono en términos muy restringidos, escasamente comparable al interés mucho más preponderante del empleado y del público en general.

En este caso, la mayoría invoca el principio de libertad de contratación del Art. 1207 del Código Civil, *supra,* para justificar la validez de los pactos de no competir, sin sopesar adecuadamente que tales pactos realmente impiden la libertad de contratación presente y futura del empleado afectado, así como la libertad de contratación de futuros clientes que interesen los servicios de éste. Tales pactos en realidad son contrarios a la libertad de contratación que establece el Código Civil, que es parte esencial del régimen económico del país.

En resumen, vistas en conjunto, existen diversas y fundamentales razones jurídicas y de orden público para resolver que los pactos de no competencia, como el de marras, no deben ser favorecidos y deben estimarse en términos jurídicos como presuntamente ineficaces.

## II

La mayoría en su opinión no sólo declara válidos los pactos de no competir como regla general, sino que además formula mandatoriamente las varias condiciones concretas que deben cumplirse para ratificar tales acuerdos. Lo que es más grave aún, por puro fíat, la mayoría decreta que los contratos de no competencia en Puerto Rico pueden tener duración de hasta un año. Estas determinaciones normativas no sólo son innecesarias para resolver el caso particular ante nos, sino que, además, van más allá del ámbito propio de nuestras facultades como Tribunal Supremo.

Como bien señala la mayoría, tenemos ante nos un asunto novel que no está preceptuado por legislación ni pautado por nuestra jurisprudencia. Para tal situación el

Código Civil nos requiere resolver "conforme a equidad, que quiere decir que se tendrá en cuenta la razón natural de acuerdo con los principios generales del derecho, y los usos y costumbres aceptados y establecidos". Art. 7 del Código Civil de Puerto Rico, 31 L.P.R.A. sec. 7. Sin embargo, nuestra labor se limita a resolver el caso concreto ante nos. *Ef. Litográficos v. Nat. Paper & Type Co.*, 112 D.P.R. 389 (1982); *Robles Ostolaza v. U.P.R.*, 96 D.P.R. 583 (1968). No nos corresponde decretar la normativa respecto al asunto en cuestión porque la tarea de legislar es función primordial de la Asamblea Legislativa. *Márquez v. Tribl. Superior*, 85 D.P.R. 559, 565 (1962); *Vda. de Ruiz v. Registrador*, 93 D.P.R. 914, 934–936 (1967). Ello es particularmente cierto cuando se trata de asuntos como el que tenemos ante nos ahora, que pueden ser preceptuados de maneras diversas, dependiendo de los valores e intereses económicos que se quieran favorecer.

Las cuestiones del término y de en qué circunstancias puede ser válido un acuerdo de no competir en el campo laboral son materias que aparejan juicios valorativos sobre política económica, que le compete hacer al legislador, no a este Tribunal.

Por esta otra razón también debo limitar mi voto a concurrir con el resultado al que llega la mayoría.