Estado Libre Asociado de Puerto Rico
TRIBUNAL DE APELACIONES
PANEL VIII

| | | |
|---|---|---|
| LUZ PETROCELLI<br><br>*Apelante*<br><br><br>v.<br><br><br>T MOBILE PUERTO RICO<br><br>*Apelado* | KLAN202500266 | Apelación procedente del Tribunal de Primera Instancia, Sala Superior de Ponce<br><br>Caso Núm.:<br>JD2022CV00157<br><br><br>Sobre:<br>Discrimen en el empleo por razón de embarazo, por sexo, por origen nacional y represalias |

Panel integrado por su presidente, el Juez Rivera Colón, el Juez Adames Soto y la Jueza Santiago Calderón

Santiago Calderón, Jueza Ponente

**SENTENCIA**

En San Juan, Puerto Rico, a 22 de mayo de 2025.

Comparece ante nos la señora Luz Petrocelli (señora Petrocelli o parte apelante) mediante recurso de *Apelación*, presentado el 29 de marzo de 2025. En su recurso, la apelante solicita que se revoque la *Sentencia*[1], emitida y notificada el 28 de febrero de 2025, por el Tribunal de Primera Instancia, Sala Superior de Ponce (TPI o foro apelado). Mediante el referido dictamen, el TPI declaró *Ha Lugar* la *Moción de Sentencia Sumaria*[2] presentada por T-Mobile Puerto Rico (T-Mobile o parte apelada) y desestimó la *Demanda Enmendada*[3].

Por los fundamentos que exponemos a continuación **confirmamos** la *Sentencia* apelada.

**I.**

El 18 de marzo de 2022, la parte apelante presentó una *Demanda*[4] en contra de T-Mobile. En su reclamación, alegó que la

---

[1] Apéndice del recurso de *Apelación*, págs. 238-270.
[2] Apéndice del recurso de *Apelación*, págs. 37-60.
[3] Apéndice del recurso de *Apelación*, págs. 8-17.
[4] Apéndice del recurso de *Apelación*, págs. 1-7.

parte apelada discriminó contra esta por razón de embarazo, sexo y su origen nacional, al no concederle los ajustes de horario que solicitó. Además, adujo que la compañía tomó represalias contra esta por reclamar sus derechos. La señora Petrocelli solicitó, entre otras cosas, una cantidad no menor de doscientos cincuenta mil dólares ($250,000.00) por concepto de los daños ocasionados por T-Mobile.

Posteriormente, el 27 de julio de 2022, la parte apelante presentó una *Demanda Enmendada* en la cual expandió sus alegaciones anteriores. Asimismo, alegó que T-Mobile la despidió constructivamente al no concederle los cambios de horarios solicitados. En esta ocasión, solicitó una compensación no menor de cuatrocientos cincuenta mil dólares ($450,000.00) en concepto de daños por su despido constructivo discriminatorio e injustificado por razón de sexo, embarazo, origen nacional y represalias.

Así las cosas, el 12 de agosto de 2022, T-Mobile presentó su *Contestación a Demanda*[5] en la cual alegó que a la parte apelante se le concedieron sus ajustes de horarios y turnos de trabajo, según los solicitó, y conforme a las necesidades de la localidad y operaciones dentro de esta. Igualmente, adujo que la señora Petrocelli conocía las normas de la apelada en cuanto a trabajar horarios variables y fines de semana. Por último, negó las alegaciones sobre discrimen por razón de embarazo, sexo y nacionalidad.

Además, el 16 de septiembre de 2022, T-Mobile presentó su *Contestación a Demanda Enmendada*[6]. En síntesis, reiteró que no se cometieron actos ilegales y discriminatorios en contra de la apelante. A su vez, informó que la señora Petrocelli renunció libre y

---

[5] Apéndice del recurso de *Apelación*, págs. 18-26.
[6] Apéndice del recurso de *Apelación*, págs. 27-36.

voluntariamente a su empleo, por lo que no constituyó un despido constructivo.

Tras concluir el descubrimiento de prueba, el 1 de marzo de 2024, la parte apelada presentó una *Moción de Sentencia Sumaria*, en la que propuso 82 hechos esenciales y pertinentes sobre los cuales no hay controversia. Además, para sustentar su petitorio incluyó 17 anejos, a saber: transcripción de la toma de deposición de la señora Petrocelli, solicitud de empleos, formularios de T-Mobile "*candidate form*", carta de oferta de empleo, "*employment acknowledgment*", firma electrónica de la parte apelante, descripción del puesto, correos electrónicos sobre cambios de horario, cartas de T-Mobile sobre aprobación de cambio de horario, carta de renuncia de la parte apelante y la Orden Ejecutiva OE2021-019.

En síntesis, esbozó que la señora Petrocelli comenzó a trabajar en T-Mobile en el puesto de "*Mobile Expert*". Sostuvo que la parte apelante solicitó varios ajustes o acomodos a sus turnos de trabajo por razones personales, los cuales fueron concedidos en su mayoría. Añadió que, el 10 de febrero de 2022, previo a incorporarse en el trabajo luego de una licencia de maternidad, la señora Petrocelli solicitó acomodo y ajuste a sus turnos de trabajo para el cuido de sus hijos. Así las cosas, solicitó tres (3) sábados libres al mes y permanecer en un horario fijo hasta las 4:30pm durante la semana. Analizada la solicitud, T-Mobile le concedió dos (2) sábados libres al mes y salir del trabajo a las 4:30pm cuatro (4) días en la semana. Este ajuste era efectivo desde el 2 de marzo hasta el 31 de mayo de 2022. De igual modo, aseveró que no le pudo conceder tres (3) sábados libres al mes por necesidades operacionales de la localidad donde trabajaba la señora Petrocelli. Reiteró que la renuncia fue libre y voluntaria y no constituyó un despido constructivo bajo la

Ley de Indemnización por Despido sin Justa Causa, *Ley Núm. 80 de 30 de mayo de 1976*[7].

Inconforme, la parte apelante presentó una *Moción en Oposición a Solicitud de Sentencia Sumaria*[8]*;* y como anejo, la transcripción de la toma de deposición de la señora Petrocelli. Así mismo, arguyó que la parte apelada incumplió con la Regla 6.2 de Procedimiento Civil[9] referente a los modos de negar (las alegaciones), al no exponer una relación sucinta de los hechos demostrativos de las defensas que le asistieron. Por ende, solicitó al TPI que diera por admitidos los hechos alegados en su *Demanda Enmendada*, a saber, los párrafos: 15 a 26, 28 a 30, 33 a 34, 41 a 42, 47, 49, 58, 61, 63, 67 a 68, 70, 72, 79 y 87.

De igual forma y en oposición, T-Mobile presentó una *Réplica a Moción en Oposición a Solicitud de Sentencia Sumaria*[10] en la cual argumentó que la señora Petrocelli se limitó a señalar en su escrito el incumplimiento con la Regla 6.2 de Procedimiento Civil, *supra.* Además, estableció que, un año y medio luego de la *Contestación a Demanda Enmendada*, ese argumento nunca se levantó y que con esto pretendió derrotar la *Moción de Sentencia Sumaria*. Más aún, adujo que la parte apelante incumplió con la Regla 36.3 de Procedimiento Civil[11], debido a que, omitió hacer referencia a los párrafos enumerados por la parte promovente que entendía que estaban en controversia, y para cada uno, detallar la evidencia admisible que sostuviera su impugnación. Por último, arguyó que la parte apelante no podía descansar en las aseveraciones contenidas en sus alegaciones.

En vista de lo anterior, el 28 de febrero de 2025, el foro apelado declaró *Ha Lugar* la *Moción de Sentencia Sumaria*

---

[7] 29 LPRA sec. 185a.
[8] Apéndice del recurso de *Apelación*, págs. 150-199.
[9] 32 LPRA Ap. V, R. 6.2.
[10] Apéndice del *Alegato en Oposición a Apelación*, págs. 3-7.
[11] 32 LPRA Ap. V, R. 36.3.

presentada por T-Mobile, dictó *Sentencia* y desestimó la *Demanda.*

En esta, formuló las siguientes determinaciones de hechos incontrovertidos:

1. Previo a trabajar en T-Mobile, la Demandante trabajó en la tienda de zapatos Foot Locker localizada en el centro comercial Mayagüez Mall por espacio de seis (6) años, de 2011 a 2017, como "Sales Associate". (Transcripción de la Deposición tomada a Petrocelli el 23 de febrero de 2023, página 23, líneas 16-25; página 24, líneas 1-5, 14-15 como Exhibit 1).

2. La Demandante también trabajó en la tienda de telefonía Claro por dos (2) años, de 2015 a 2017, a la vez que trabajaba en Foot Locker. Exhibit 1, 28:17-22.

3. El 5 de abril de 2017, la Demandante completó una Solicitud de Empleo para una plaza de "Retail Sales Associate"2 en T-Mobile. Exhibit 1, 32: 9-12; 33: 2-11; Solicitud de Empleo fechada 5 de abril de 2017, incluida como Exhibit 2.

4. Los "Retail Sales Associates" o "Mobile Experts" son las personas que trabajan en las tiendas o quioscos de T-Mobile vendiendo los servicios que ofrece T-Mobile, así como equipo y accesorios, entre otros. Exhibit 1, 46: 18-22.

5. La Solicitud de Empleo de T-Mobile que completó la demandante incluye una sección, la cual el candidato a empleo tiene que leer cuidadosamente antes de firmar. Mediante la firma de la Solicitud, el candidato confirma haber leído y entendido la información contenida y someter la misma constituye el consentimiento a dichos términos y condiciones. Con su firma el candidato acepta lo siguiente: "I further understand that T-Mobile may change any terms of my employment, including but not limited to, work assignments, job duties, work schedules, pay levels, commission earnings and eligibility, bonus eligibility, and/or work locations". (Énfasis nuestro.) Exhibit 1, 33: 24-23; 34: 1-16; Exhibit 2.

6. Al momento de completar la Solicitud de Empleo, la Demandante conocía que parte de los términos y condiciones de empleo en T-Mobile era que la podían cambiar de localización a otra tienda, así como cambiar los turnos de trabajo, lo cual es cónsono con la industria de "retail". Exhibit 1, 35: 3- 15.

7. Como parte del proceso de solicitud de empleo, la Demandante tenía que completar una forma titulada "Candidate Form: Job Response" la cual incluía una serie de preguntas. Exhibit 1, 36-37; Candidate Form: Job Response fechada 13 de marzo de 2017, incluida como Exhibit 3.

8. En el Candidate Form: Job Response se pregunta si el candidato está dispuesto y tiene la flexibilidad y

disponibilidad para trabajar turnos de trabajo según se le asignen, incluyendo mañanas, noches, fines de semana, horas extra y días festivos. La Demandante contestó sí a esta pregunta, sin restricción. Exhibit 1, 37: 9-17; Exhibit 2, pág. 2.

9. En el Candidate Form; Job Response, se pregunta, además, qué turnos de trabajo el candidato no está disponible para trabajar, a lo cual la Demandante contestó que podía trabajar cualquier itinerario de trabajo. Exhibir 1, 37: 18-24; Exhibit 2, pág. 2.

10. Durante la entrevista de trabajo, la Demandante no mencionó que tenía alguna necesidad de acomodo en cuanto a los turnos de trabajo. No mencionó nada en cuanto a no estar disponible ciertos días o durante ciertas horas de operación. Exhibit 1, 39: 6-9, 21-25; 40:1.

11. Luego del proceso de solicitud de empleo y entrevista, T-Mobile le cursó una oferta de empleo a la Demandante y le envió una carta incluyendo los términos de empleo. Exhibit 1, 40: 5-10; Carta de Oferta de Empleo fechada 2 de mayo de 2017, incluida como Exhibit 4.

12. La carta de oferta de empleo de T-Mobile indicaba que la Demandante comenzaría el 19 de mayo de 2017, ocupando la plaza de "Retail Sales Associate" a tiempo parcial. Indicaba, además, que la Demandante sería asignada a la tienda localizada en Plaza del Oeste en San Germán. Exhibit 1, 41: 2-9; Exhibit 4.

13. La carta de oferta de empleo indicaba que la localización de empleo (tienda) podía cambiar en un futuro para lograr o alcanzar las necesidades del negocio. La Demandante conocía que era una posibilidad que se le cambiara de localización. Exhibit 1, 41: 10-16; Exhibit 4.

14. Según se desprende de la carta de oferta de empleo, la Demandante acordaba a inicialmente trabajar cualquier turno de trabajo, que podía incluir día, tarde, noche, así como fines de semana y/o feriados dependiendo en las necesidades del negocio. La Demandante conocía que esto era parte del trabajo y la naturaleza del mismo y la industria. Exhibit 1, 41: 17-25; 42: 1-8; Exhibit 4.

15. Como parte del adiestramiento a los nuevos empleados, T-Mobile les informaba a los empleados que pueden accesar el Manual del Empleado y otras políticas a través del portal conocido como T-Nation. La Demandante fue informada sobre lo anterior. Exhibit 1, 43: 18-24.

16. La Demandante firmó de manera electrónica un "Employee Acknowledgment" mediante el cual indicó entender y reconocer que el Código de Conducta, el Manual del Empleado y el Suplemento para Puerto Rico estaban disponibles para revisión en el portal T-Nation.

Exhibit 1, 45:7-21; Employee Acknowledgment y firma electrónica, incluidos como Exhibit 5.

17. La descripción de la plaza de Mobile Expert establece, como otros requisitos, que el empleado se tiene que ajustar a un itinerario flexible que incluye día, tarde, noche, fines de semana y días feriados. La Demandante conocía este requisito el cual es cónsono con el tipo de industria. Exhibit 1, 47: 16-25; 48: 1-14; Descripción de la Plaza de Mobile Expert, incluida como Exhibit 6.

18. Luego de su adiestramiento, en junio de 2017, la Demandante fue ubicada en la tienda localizada en Plaza Oeste en San Germán y luego, en septiembre u octubre de 2017, fue relocalizada a la tienda localizada en Plaza del Caribe en Ponce. Este cambio se dio inicialmente porque la tienda de Plaza Oeste cerró temporeramente por el paso del huracán María. Exhibit 1, 51: 1-25; 52: 1-13.

19. La Demandante continuó trabajando en la tienda localizada en Plaza del Caribe hasta junio 2020, cuando, junto a otros empleados de ventas, pasó a la tienda localizada en Monte Town Center en Ponce. Exhibit 1, 54: 9-20; 55.

20. La Demandante trabajó en la tienda localizada en Monte Town Center en Ponce hasta enero 2021, cuando pasó a trabajar a la tienda localizada en Plaza Prados del Sur en Santa Isabel. Exhibit 1, 55: 20-22.

21. La Compañía le indicó a la Demandante que el cambio de localización a la tienda de Plaza Prados del Sur respondió a que, por razones operacionales, no le podían seguir honrando el ajuste a sus horarios y turnos de trabajo en la tienda de Monte Town Center. Exhibit 1, 147: 5-16.

22. A la Sra. Waleska Torres, empleada de ventas, también la reubicaron de la tienda localizada en Monte Town Center a la tienda localizada en Plaza Prados del Sur en Santa Isabel. Exhibit 1, 73: 3-25; 74: 1-14.

23. Durante el tiempo que la Demandante trabajó en la tienda localizada en Plaza Prados del Sur en Santa Isabel, su supervisor fue el Sr. Julio Cortes y el Sr. Edwin Feliciano era el Gerente de Distrito. Exhibit 1, 79: 6-11.

24. La tienda localizada en Plaza Prados del Sur en Santa Isabel opera los siete (7) días a la semana. El horario de operaciones es de 9:00 a.m. a 7:00 p.m. de lunes a sábado, y los domingos de 11:00 a.m. a 5:00 p.m. Exhibit 1, 79: 12-19.

**B. Solicitudes de cambio de turnos de trabajo y horarios**
25. En julio 2017, aproximadamente dos (2) meses luego de comenzar a trabajar en T-Mobile, la Demandante le envió un correo electrónico a la Sra. Liz Walker solicitando un acomodo o ajuste en sus turnos de trabajo, a ser efectivo en agosto de 2017, debido a que se mudaba a Santa Isabel y

tenía que recoger a su hija a la escuela. La Demandante indicó que de lunes a viernes solo podía trabajar un día pasadas las 4:30 p.m., y que ese día tenía que ser martes o miércoles. Exhibit 1, 82:10-19; Correo electrónico fechado 18 de julio de 2017, incluido como Exhibit 7.

26. El 8 de agosto de 2017, la Sra. Walker le respondió a la Demandante sobre su solicitud indicando que el acomodo había sido aprobado por ese semestre y que se estaría reevaluando el acomodo en enero de 2018. Exhibit 1, 82:23-25; 83:1-5; 85:3-6; Exhibit 8.

27. La decisión de conceder el ajuste solicitado por la Demandante en julio de 2017 se tomó entre Recursos Humanos y el Gerente de Distrito. Exhibit 1, 82: 23-25; 83: 1-16.

28. A pesar de los movimientos posteriores a trabajar en las tiendas localizadas en Plaza del Caribe y Monte Town Center en Ponce, la Demandante continuó con el mismo acomodo/ajuste de horario. Exhibit 1, 87; 88:1-6.

29. El 24 de junio de 2020, la Demandante le envió un correo electrónico a la Sra. Solange Corujo de Recursos Humanos solicitando un acomodo/ajuste adicional para solamente trabajar fines de semana alternos. Exhibit 1, 89:25; 90:1-8; Correo electrónico fechado 24 de junio de 2020, incluido como Exhibit 9.

30. Ese mismo día, 24 de junio de 2020, la Sra. Corujo respondió al mensaje de la Demandante donde solicitaba un ajuste, indicando que estaba copiando a Joel Ruiz, Carlos Burgos y Yesenia Vélez para que consideraran la solicitud. Esto debido a que varias personas participan en el proceso de considerar las solicitudes de acomodos o ajustes en los horarios y turnos de trabajo para ver si son cónsonas con las necesidades de las tiendas. Exhibit 1, 90:16-25; 91: 1-11.

31. El 6 de julio de 2020, la Sra. Yesenia Vélez le envió una carta a la Demandante indicando que la Compañía había aprobado su solicitud, permitiéndola trabajar fines de semana alternos. Exhibit 1, 91:20-25; 92:1-9; Carta fechada 6 de julio de 2020, incluida como Exhibit 10.

32. Cuando la Demandante fue relocalizada a la tienda de Plaza Prados del Sur en Santa Isabel, le informó a su supervisor, Julio Cortés, sobre los acuerdos alcanzados relacionados a sus turnos y horarios de trabajo. Exhibit 1, 94: 3-5.

33. Conociendo los acuerdos alcanzados con la Demandante relacionados a sus turnos y horarios de trabajo, el Sr. Cortés le asignó los turnos de trabajo a la Demandante a base del acuerdo que tenía, honrando así el mismo. Exhibit 1, 94: 6-12, 20-22.

34. Durante los primeros meses que trabajó en la tienda de Plaza Prados del Sur en Santa Isabel, de enero a julio de 2021, la Demandante no tuvo ningún problema o situación con el Sr. Cortés relacionado a sus turnos de trabajo y que se honraran los acuerdos sobre los turnos y horarios. Exhibit 1, 94: 23-25; 95: 1-8, 22-25; 96: 1.

35. El 10 de febrero de 2022, la Demandante le envió un correo electrónico a Edwin Feliciano y Millery Sifre, Human

Resources Partner, solicitando tres (3) sábados libres al mes y continuar con su horario de salir a las 4:30 p.m. durante la semana. Exhibit 1, 99: 10-18; 100: 1-4; Correo electrónico fechado 10 de febrero de 2022, incluido como Exhibit 11.

36. La Demandante incluyó a Edwin Feliciano y Millery Sifre en el mensaje del 10 de febrero de 2022, toda vez que en la toma de decisiones sobre cambios o ajustes de turnos y horarios de trabajo participan varias personas. Exhibit 1, 100: 9-22.

37. Al solicitar tres (3) sábados libres al mes, la Demandante indicó que su esposo también trabajaba en la industria de "retail" y que no le brindaban flexibilidad de horario. Exhibit 1, 101: 25; 102: 1-8. El esposo de la Demandante solicitó tener un segundo sábado al mes libre, pero su patrono rechazó su solicitud. Exhibit 1, 103: 6-12.

38. El 2 de marzo de 2022, la Sra. Sifre le envió un correo electrónico a la Demandante incluyendo una carta con la respuesta a la solicitud de ajuste de horario. Exhibit 1, 104: 3-9.

39. Mediante carta fechada 2 de marzo de 2022, T-Mobile le informó a la Demandante que de los tres (3) sábados libres al mes, le concedían dos (2) sábados al mes alternos y salir del turno de trabajo los lunes, martes, jueves y viernes a las 4:30 p.m. Exhibit 1, 106: 3-8; Carta fechada 2 de marzo de 2022, incluida como Exhibit 12.

40. El ajuste de horario sería efectivo del 2 de marzo al 31 de mayo de 2022. Exhibit 1, 111:9- 12. Al culminar el periodo de efectividad, los ajustes serían realizados de acuerdo a la necesidad de la localidad y aprobados por el gerente. Exhibit 1, 111: 18-21.

41. Del 2 de marzo al 31 de mayo de 2022, los horarios que le fueron asignados a la Demandante por su gerente fueron acorde con los acuerdos alcanzados sobre los horarios y turnos de trabajo. Exhibit 1, 115: 7-14.

42. Durante el mes de abril de 2022, la Demandante nuevamente le solicitó a su gerente tres (3) sábados libres al mes, pero éste le indicó que tendría dos sábados libres conforme lo acordado. Seguidamente, la Demandante se ausentó ese tercer sábado del mes de abril que no se le concedió. Exhibit 1, 118: 6-12. El gerente no amonestó a la Demandante por ausentarse el sábado al que fue puesta en horario. Exhibit 1, 119:17-20.

43. El 10 de mayo de 2022, la Demandante sostuvo una conversación con la Sra. Sifre de Recursos Humanos sobre el tema de los horarios y turnos de trabajo, y al día siguiente la Demandante le envió un correo electrónico a la Sra. Sifre sobre la conversación. Exhibit 1, 120: 11-24; Correo electrónico fechado 11 de mayo de 2022, incluido como Exhibit 13.1

44. La Sra. Sifre respondió al correo electrónico de la Demandante sobre la conversación que tuvieron el 10 de mayo de 2022. La Sra. Sifre indicó en su mensaje que, según dialogado, el ajuste que se había concedido era efectivo hasta el 31 de mayo de 2022, y que luego de esa fecha, su gerente la podía ayudar con peticiones de horarios, sujeto a las necesidades de la localidad, las cuales no siempre podrían ser aprobadas. Exhibit 1, 121: 1-11; Correo electrónico fechado 12 de mayo de 2022, incluido como Exhibit 14.1

45. La Demandante dialogó con la Sra. Sifre en varias ocasiones sobre el tema de los ajustes más allá del 31 de mayo de 2022. La Sra. Sifre siempre le indicó que el tener tres (3) sábados libres al mes no era una posibilidad. Exhibit 1, 128: 19-25; 129: 1-13.

46. Toda vez que no era posible concederle a la Demandante tres (3) sábados libres al mes, ésta dialogó con la Sra. Sifre sobre la posibilidad de cambiar de localidad. La Sra. Sifre le indicó a la Demandante que ese tema lo tenía que dialogar con el Gerente de Distrito, Edwin Feliciano. Exhibit 1: 119; 8-18.

47. La Demandante no habló con Edwin Feliciano sobre un posible cambio de tienda luego de que la Sra. Sifre así se lo recomendara. Exhibit 1, 131: 21-23.

48. La Demandante presentó una carta de renuncia efectivo el 12 de julio de 2022. Exhibit 1, 133: 1-3; Carta de renuncia fechada 8 de julio de 2022, incluida como Exhibit 15.15

**C. Reclamación de discrimen por embarazo y sexo**
49. La Demandante alega que el cambio de la tienda localizada en Monte Town Center a Plaza Prados de Sur en Santa Isabel fue motivado por un ánimo discriminatorio por su estado de embarazo. Exhibit 1, 146:16-21.

50. La Demandante alegó que el cambio de localización de Monte Town Center a Plaza Prados del Sur en Santa Isabel fue porque estaba embarazada, (no porque es mujer). Exhibit 1, 149: 6-18.

51. Durante su embarazo, la Demandante se mantuvo empleada y trabajó ininterrumpidamente hasta la fecha que dio a luz a su hijo. Exhibit 1, 142: 16-18.

52. Durante su embarazo, la Demandante mantuvo el mismo salario y los mismos beneficios y horarios/turnos acordados. Exhibit 1, 142:19-21.

53. El 24 de marzo de 2021, antes de dar a luz, la demandante llevó a cabo una actividad social (fuera de horas laborables) para revelar el sexo de su bebé o "gender reveal". Correo electrónico fechado 15 de marzo de 2022, y anejo incluido como Exhibit 16.17

54. La actividad del "gender reveal" se llevó a cabo en el negocio de la pareja de un compañero de trabajo, Roberto Rosario, quien trabajaba en la tienda de T-Mobile localizada en Plaza del Caribe en Ponce. Exhibit 1, 161: 4-14.

55. Roberto Rosario fue la persona quien llevó a cabo la decoración para la actividad. Exhibit 1, 161: 15-24.

56. Para la fecha del "gender reveal", el Sr. Rosario se encontraba fuera del trabajo en T-Mobile, en cuarentena, debido a que había habido un empleado de su tienda quien dio positivo a COVID19. Exhibit 1, 162: 14-25; 163: 1-19.

57. Para el 24 de marzo de 2021, estaba vigente la Orden Ejecutiva 2021-019 del Gobernador de Puerto Rico, Hon. Pedro R. Pierluisi, a los Fines de Implementar Medidas para Enfrentar la Emergencia Causada por el COVID-19 en Puerto Rico fechada 11 de marzo de 2021. Dicha OE-2021-019 establecía órdenes de cuarentena y de aislamiento. OE-2021-019 incluida como Exhibit 17.

58. Al otro día de la actividad, la Demandante se presentó a trabajar y el Sr. Cortés alegadamente no le permitió acceso a la tienda y le dijo que llamaría a Recursos Humanos para ver si ella podía entrar y continuar con su día de trabajo. Exhibit 1, 168: 2-6.

59. Al no poder comunicarse con Recursos Humanos, el Sr. Cortés, alegadamente, le dijo a la Demandante que se fuera para su casa. Exhibit 1, 168: 15-18.

60. Luego de que el Sr. Cortés le indicó a la Demandante que se debía ir para su casa, éste alegadamente la llamó para decirle que se había comunicado con el Sr. Edwin Feliciano y se había autorizado que trabajara. Exhibit 1, 168: 18-24.

61. Cuando el Sr. Cortés se comunicó con la Demandante para indicarle que podía regresar a trabajar, ésta le informó que no se sentía bien, por lo que no se reportó a trabajar. Exhibit 1, 169: 3-10.

62. La Demandante no le reportó a Recursos Humanos el alegado incidente con el Sr. Cortés que ocurrió en marzo de 2021, luego del "gender reveal", sino hasta febrero de 2022. Exhibit 1, 173: 2- 25; 174: 1-15.

63. El 15 de marzo de 2022, la Demandante le envió un correo electrónico a Millery Sifre al cual anejó un documento detallando lo alegadamente ocurrido en marzo de 2021, sobre el incidente del "gender reveal" cuando no se le permitió entrar al trabajo. Exhibit 1, 152: 24-25; 153: 1-3; 154: Correo electrónico fechado 15 de marzo de 2022, y anejo incluido como Exhibit 16.

64. En el documento resumiendo lo acontecido y la conversación con el Sr. Cortés en el incidente del "gender reveal", la Demandante relató que, al llegar a la tienda a trabajar, el Sr. Cortés le preguntó quién estaba en la

actividad, y que ella la respondió "las dos hermanas de mi esposo con sus hijos, mi suegra, la hija de mi esposo y Roberto". Exhibit 1, 164:18-23.

65. La Demandante dio a luz en julio de 2021. Exhibit 1, 95: 16-17.

66. La Demandante trabajó hasta la primera semana de julio de 2021, y se reintegró al trabajo en febrero de 2022. Exhibit 1, 95: 18-21; 96: 2-8.

67. La Demandante disfrutó de la licencia de maternidad. Exhibit 1, 142: 22-23.

68. La Demandante recibió el pago de la licencia de maternidad. Exhibit 1, 142: 24-25.

69. La Demandante no fue despedida mientras se encontraba en licencia de maternidad ni a su regreso al trabajo. Exhibit 1, 143: 1-10.

70. La Demandante dio a luz en julio de 2021 y presentó su renuncia un año más tarde, en julio de 2022. Exhibit 1, 143: 17-21.

**D. Reclamación de discrimen por origen nacional**

71. Petrocelli nació en Venezuela. Exhibit 1, 18:21-22.

72. El papá de Petrocelli era venezolano y su mamá era puertorriqueña. Exhibit 1, 21:1-2.

73. Petrocelli vivió en Venezuela hasta que se relocalizó a Puerto Rico en el 1997, cuando tenía doce (12) años de edad. Desde entonces ha vivido ininterrumpidamente en Puerto Rico. Exhibit 1, 18:18-20, 23-25; 19:1-4; 22:1-6.

74. Petrocelli es ciudadana americana desde que nació, toda vez que su mamá era ciudadana americana. Exhibit 1, 22:7-12.

75. La Demandante alega que el Sr. Cortés le comentó que le habían dicho que los venezolanos de mucho dinero maltrataban a los empleados. Exhibit 1, 135: 10-20. Este fue el único comentario que el Sr. Cortés alegadamente le hizo a la Demandante relacionado al país donde nació. Exhibit 1, 137: 23-24.

76. Las otras personas que la Demandante alega discriminaron en su contra, Edwin Feliciano, Solange Corujo y Millery Sifre, nunca hicieron comentarios relacionados al hecho que la Demandante fuera venezolana. Exhibit 1, 134: 5-25; 135: 11 138: 17-25.

77. La Demandante alega que la alegada reacción del Sr. Cortés al "gender reveal" fue motivada por un ánimo discriminatorio por ésta ser venezolana. Apoya su alegación en que el Sr. Cortés tenía conocimiento que las personas que

asistieron no eran familia directa de la Demandante, sino del esposo. Exhibit 1, 139: 1-25.

78. La Demandante alega que se discriminó en su contra por ella no ser de Puerto Rico, necesitar ayuda para el cuido de sus hijos y que estaba sola. Exhibit 1, 141:12-18.

**E. Reclamación de Represalias**

79. La Demandante alega que el cambio de la tienda de Ponce a la tienda de Santa Isabel en enero 2021 fue en represalias por ésta haber estado embarazada. Exhibit 1,149: 25; 150: 1-14.

80. La Demandante alega que la Compañía tomó represalias en su contra por haber presentado la presente Demanda en su contra. Exhibit 1, 151: 4-8.

81. La Demandante no tiene conocimiento sobre quiénes conocían que ésta había presentado la presente Demanda. Exhibit 1, 151: 9-11.

82. Además del cambio a la tienda de Santa Isabel en enero 2021, la negativa a concederle tres (3) sábados libres al mes y el incidente relacionado al "gender reveal" en marzo 2021, no hay otro incidente o acción de T-Mobile que la Demandante entienda estaba relacionado a su embarazo, sexo u origen nacional o que haya sido en represalias. Exhibit 1, 175: 7-12.

El TPI concluyó que el traslado de la apelante no representó una imposición de condiciones de trabajo más onerosas, ni que sometiera a vejámenes o humillaciones de hechos o de palabra. Tampoco significó una alteración en las responsabilidades de la señora Petrocelli, ya que mantuvo su puesto, salario y beneficios, junto a los ajustes o acomodos solicitados, de acuerdo con la necesidad de la localidad. Las acciones tomadas por la parte apelada fueron razonables, legítimas y relacionadas a las operaciones y al mejor funcionamiento de la empresa. La apelante no demostró que las acciones de T-Mobile fueran arbitrarias, caprichosas o irrazonables y de tal gravedad que no le quedó otra alternativa que renunciar.

Inconforme con el dictamen, la parte apelante presentó el recurso de epígrafe y planteó el siguiente señalamiento de error:

El TPI cometió un grave error manifiesto de derecho y abusó de su discreción al emitir una *Sentencia* contraria

a derecho y abusó de su discreción judicial al no dar por admitidos los hechos contenidos en los párrafos de la *Demanda Enmendada* que no fueron negados conforme a la Regla 6.2 de Procedimiento Civil y al descartar el testimonio incontrovertido de la apelante en su deposición.

Por su parte, el 30 de abril 2025, T-Mobile presentó su *Alegato en Oposición a Apelación* y argumentó que la señora Petrocelli no estableció cómo el TPI cometió un grave error manifiesto de derecho o abusó de su discreción. Finalmente, reiteró el error fatal de la apelante al omitir los requisitos establecidos en la Regla 36.3(b)(2)[12], por lo que no logró controvertir los hechos presentados por T-Mobile.

Perfeccionado el recurso y examinados los documentos que obran en el expediente, estamos en posición de resolver.

## II.

### -A-

La Regla 6.2(a) de Procedimiento Civil[13] dispone que la parte que responde a una alegación debe incluir "sus defensas contra cada reclamación interpuesta, junto con una relación de los hechos demostrativos de que le asisten tales defensas"[14]. Existen dos (2) tipos de defensas: "defensas afirmativas las cuales son defensas trayendo materia nueva – materia no alegada en la demanda – y las defensas que constituyen una negación de lo expuesto en la reclamación"[15]. El inciso (d) de la Regla 6.2[16] dispone que "[l]as negaciones impugnarán en lo sustancial las aseveraciones correspondientes y expresarán afirmativamente la versión de los hechos negados por la parte que presenta la alegación responsiva". El inciso antes mencionado también propone que las negaciones se pueden hacer de manera específica, sobre cada una de las aseveraciones o párrafos; o de manera general, salvo aquellas que la

---

[12] 32 LPRA Ap. V, R. 36.3(b)(2).
[13] *Íd.*, R. 6.2(a).
[14] *Conde Cruz v. Resto Rodríguez*, 205 DPR 1043, 1063 (2020).
[15] R. Hernández Colón, *Derecho Procesal Civil*, 6ta ed., Ed. Lexis Nexis, 2017, sec. 2402, pág. 288.
[16] 32 LPRA Ap. V, R. 6.2(d).

parte admitió expresamente[17]. Si a la parte que le corresponde realizar una alegación responsiva incumple total o parcialmente con los requisitos de la regla, "el tribunal, a iniciativa propia o a solicitud de parte, podrá dictar una orden para requerirle que satisfaga las exigencias de dicho inciso"[18]. En los comentarios del Comité Asesor Permanente de Reglas de Procedimiento Civil se explicó que las contestaciones a la demanda "se han convertido en documentos que no tienen valor real alguno para el tribunal ni para los demandantes [...] se limitan, por lo general, a negar o aceptar escuetamente las aseveraciones de la demanda y a enumerar un catálogo de defensas, sin aportar ningún hecho que las sustente"[19]. Un documento así no permite aclarar los hechos medulares de la controversia ni expone la teoría de defensa de los demandados[20]. El propósito de esta regla es delimitar la controversia, propiciar la intervención del tribunal en las etapas iniciales y ayudar a delimitar el descubrimiento de prueba[21].

Por otro lado, la Regla 6.4, referente a las consecuencias de no negar, establece que, salvo las alegaciones sobre el monto de daños, cualquier alegación que requiere una alegación responsiva "se considerará admitidas si no fueron negadas en la alegación responsiva"[22]. El Tribunal Supremo ha expresado que "si la parte demandada no procede conforme lo dispone el ordenamiento jurídico procesal civil, opera una presunción contraria para la defensa de su versión de los hechos"[23].

---

[17] *Íd.*
[18] 32 LPRA Ap. V, R. 6.2(b).
[19] *Informe de Reglas de Procedimiento Civil*, Secretariado de la Conferencia Judicial y Notarial del Tribunal Supremo de Puerto Rico, marzo de 2008, pág. 73.
[20] *Íd.*
[21] *Íd.*, págs. 73-74.
[22] 32 LPRA Ap. V, R. 6.4.
[23] *Mitsubishi Motor Sales of Caribbean, Inc. v. Lunor, Inc.*, 212 DPR 807, 829 (2023).

**-B-**

El objetivo de la sentencia sumaria es "propiciar la solución justa, rápida y económica de litigios civiles que no contengan controversias genuinas de hechos materiales"[24]. La Regla 36 de Procedimiento Civil establece los parámetros de este mecanismo[25]. Estas disponen que:

> [P]ara dictarse sentencia sumaria, es necesario que, de las alegaciones, deposiciones, contestaciones a interrogatorios y admisiones ofrecidas, en unión a las declaraciones juradas, si las hubiese, surja que no hay controversia real sustancial en cuanto a ningún hecho material y que, como cuestión de derecho, se debe dictar sentencia sumaria a favor de la parte promovente[26].

La Regla 36.3(a)(4) establece que la parte promovente "está obligada a [desglosar los hechos] en párrafos debidamente numerados y, para cada uno de ellos, especificar la página o el párrafo de la declaración jurada u otra prueba admisible en evidencia que lo apoya"[27]. De igual forma, se impone la misma responsabilidad al oponente de "citar específicamente los párrafos según enumerados por el promovente que entiende están en controversia y, para **cada uno de los que pretende controvertir, detallar la evidencia admisible que sostiene su impugnación con cita a la página o sección pertinente**"[28]. El oponente debe probar que existe una controversia sobre un hecho material que es constitutivo de la causa de acción del demandante[29].

Como norma general, si la moción procede en derecho, el tribunal debe dictar la sentencia sumaria "**a favor del promovente si la parte contraria no responde de forma detallada y específica a una solicitud debidamente formulada**"[30]. La parte oponente no

---

[24] *Const. José Carro v. Mun. Dorado*, 186 DPR 113, 128 (2012).
[25] 32 LPRA Ap. V, R. 36.
[26] *Const. Jose Carro v. Mun. Dorado*, 186 DPR 113, 128 (2012).
[27] 32 LPRA Ap. V, R. 36 (a)(4) y *SLG Zapata-Rivera v. J. F. Montalvo*, 189 DPR 414, 432 (2013).
[28] *Íd.* (Énfasis nuestro).
[29] *Oriental Bank v. Perapi*, 192 DPR 7, 26 (2014).
[30] *SLG Zapata-Rivera v. J. F. Montalvo*, 189 DPR 414, 432 (2013). (Énfasis nuestro).

puede quedarse de brazos cruzados y apoyarse meramente en sus alegaciones, es imperativo que presente su prueba[31]. Si este se aparta de las directrices, el tribunal podrá no tomar en consideración el intento de la impugnación[32]. Más aún, pudiera dictar sentencia a favor del promovente si procede en derecho[33].

Al revisar la determinación del TPI, el foro apelativo se limita a considerar los documentos que se presentaron ante el foro primario, entiéndase, las partes no pueden añadir en la apelación documentos, teorías o asuntos que no fueron presentados oportunamente[34]. Por otra parte, el foro apelativo únicamente puede determinar si existe alguna controversia sobre los hechos materiales y si se aplicó de manera correcta el derecho[35]. Así las cosas, el Tribunal Supremo discutió el estándar que debe utilizar este foro para revisar las mociones de sentencia sumaria en *Meléndez González v. M. Cuebas*[36]. Primeramente, el Tribunal de Apelaciones se encuentra en la misma posición que el TPI, sin embargo, la revisión es de *novo,* por lo que se "debe examinar el expediente de la manera más favorable hacia la parte que se opuso a la Moción de Sentencia Sumaria"[37]. De modo que, al estar en la misma posición que el TPI, se debe examinar que la moción y la oposición deben cumplir con los requisitos de forma codificados en la Regla 36 de Procedimiento Civil, *supra*[38]. Consecuentemente, al analizar la sentencia dictada por el TPI, se "debe revisar si en realidad existen hechos materiales en controversia. De haberlos, el foro apelativo intermedio tiene que cumplir con la exigencia de la Regla 36.4 de Procedimiento Civil y debe exponer concretamente cuáles hechos

---

[31] *Oriental Bank v. Perapi*, 192 DPR 7, 26 (2014); *Sánchez Montalvo v. Aut. de los Puertos,* 153 DPR 559, 570 (2001).
[32] *SLG Zapata-Rivera v. J.F. Montalvo*, 189 DPR 414, 433 (2013).
[33] *Meléndez González v. M. Cuebas*, 193 DPR 100, 111 (2015).
[34] *Vera v. Dr. Bravo*, 161 DPR 308, 334-335 (2004).
[35] *Íd.,* pág. 335.
[36] *Meléndez González v. M. Cuebas*, 193 DPR 100, 118–119 (2015).
[37] *Íd.*, pág. 118.
[38] *Íd.*

materiales encontró que están en controversia y cuáles están incontrovertidos"[39]. Finalmente explica que "de encontrar que los hechos materiales realmente están incontrovertidos, el foro apelativo intermedio procederá entonces a revisar de *novo* si el Tribunal de Primera Instancia aplicó correctamente el Derecho a la controversia"[40].

El Tribunal Supremo resolvió que los tribunales tienen discreción de examinar la evidencia que obra en los autos, aunque fuera omitida por las partes[41]. Incluso, estos pueden "obviar material que las propias partes hayan pasado por alto en sus escritos y resolver estrictamente a base de lo que haya sido presentado"[42].

**-C-**

La Constitución del Estado Libre Asociado prohíbe el discrimen por motivo de raza, color, sexo, nacimiento, origen o condición social, ni ideas políticas o religiosas[43]. La Ley de Discrimen por Razón de Edad, Raza, Color, Sexo, Origen o Condición Social, Ley Núm. 100 de 30 de junio de 1959, según enmendada[44], "prohíbe que un patrono despida, suspenda o discrimine contra un empleado por razón de edad, raza, color, sexo, origen social o nacional, condición social, afiliación política, ideas políticas o religiosas, o por ser víctima de violencia doméstica, agresión sexual o acecho"[45]. En nuestro ordenamiento jurídico existe una presunción controvertible de discrimen ilegal cuando existe un despido sin justa causa[46]. Así las cosas, para que se active esta presunción se debe demostrar que "(1) que hubo un despido o acto

---

[39] *Íd.*
[40] *Íd.,* pág. 119.
[41] *SLG Zapata-Rivera v. J.F. Montalvo,* 189 DPR 414, 433 (2013).
[42] *Íd.*
[43] Art. II, Sec. 1, Const. PR, LPRA, Tomo 1.
[44] 29 LPRA sec. 146.
[45] *Mestres Dosal v. Dosal Escandón,* 173 DPR 62, 68–69 (2008).
[46] *Ramos Pérez v. Univisión,* 178 DPR 200, 222 (2010).

perjudicial; (2) que la acción del patrono fue injustificada, y (3) **algún hecho que lo ubique dentro de la modalidad de discrimen bajo la cual se reclama**"[47]. Cumplir con este esquema revierte el peso de la prueba al patrono, quien tiene la alternativa de "presentar prueba que derrote el hecho básico; esto es, que el despido fue justificado; o destruir el hecho presumido (que el despido no fue discriminatorio); o presentar prueba para atacar ambos hechos"[48]. No obstante, el peso de persuadir al tribunal se mantiene en el empleado[49]. Si el patrono logra rebatir esta presunción, entonces corresponde al trabajador probar que realmente hubo un discrimen sin el beneficio de la presunción[50]. El Tribunal Supremo estableció que, sin esta presunción a favor del empleado, "estaríamos entonces ante una reclamación ordinaria en la que el empleado tiene la obligación de presentar evidencia que sustente su causa de acción"[51].

**-D-**

El despido por razón de embarazo es una modalidad de un discrimen por razón de sexo[52]. La Ley de Protección de Madres Obreras, Ley Núm. 3 del 13 de marzo de 1942, según enmendada, establece que "[e]l patrono no podrá, sin justa causa, despedir a la mujer embarazada"[53]. El Tribunal Supremo dispuso que la Ley Núm. 3, *supra*, le brinda una protección más extensa a la mujer embarazada que la brindada al trabajador por la Ley Núm. 100, *supra*; ya que esta no requiere que el patrono haya actuado de manera discriminatoria[54]. Para que la referida ley sea de aplicación es indispensable que "**la mujer haya sido despedida durante su**

---

[47] *Íd.* (Énfasis nuestro).
[48] *Ramírez Ferrer v. Conagra Foods PR*, 175 DPR 799, 815 (2009).
[49] *Jiménez Soto v. Carolina Catering Corp.*, 2025 TSPR 3, 12 (2025).
[50] *Ramírez Ferrer v. Conagra Foods PR*, 175 DPR 799, 815 (2009).
[51] *Ramos Pérez v. Univisión*, 178 DPR 200, 222-223 (2010).
[52] *Rivera Águila v. K-Mart de PR*, 123 DPR 599, 608 (1942).
[53] 29 LPRA sec. 469.
[54] *Soc. de Gananciales v. Centro Grafico*, 144 DPR 952, 960 (1998).

**embarazo**"[55]. Ello así porque lo determinante es que el despido haya ocurrido mientras se encontraba embarazada y no por la condición de su embarazo[56]. La presunción de la Ley Núm. 3, *supra,* le impone al patrono el peso de establecer que había razones justificadas, independientes al embarazo, para el despido de esta[57].

**-E-**

Como mencionamos anteriormente, la Constitución del Estado Libre Asociado prohíbe el discrimen por motivo de raza, color, sexo, nacimiento, origen o condición social, ni ideas políticas o religiosas[58]. Sin embargo, esta lista no es una taxativa[59]. El Tribunal Supremo añadió el discrimen por origen nacional o nacionalidad por su tangencia con la dignidad humana[60]. La Ley Núm. 100, *supra,* prohíbe expresamente, entre otros, el despido por origen social o nacional[61].

En el caso *Jiménez Soto v. Carolina Catering Corp.*[62] se estableció que, a los fines de asegurar interpretaciones consistentes en cuanto a términos o disposiciones similares sobre la Ley de Discrimen o Represalias en el Empleo, se reconoce lo dispuesto en la legislación y reglamentación federal. Esto incluye las interpretaciones judiciales de los tribunales con jurisdicción en Puerto Rico[63]. El esquema regulatorio para probar *prima facie* un despido por discrimen por origen nacional es el siguiente: "(1) que el empleado es miembro de un grupo protegido; (2) que el empleado estaba cualificado para el trabajo; (3) que el empleado fue despedido, y (4) que el patrono buscó reemplazar al empleado por otra persona con cualificaciones similares"[64]. Así las cosas, el demandante

---

[55] *Íd.,* pág. 961. (Énfasis nuestro).
[56] *Santiago v. Oriental Bank & Trust,* 157 DPR 250, 258 (2002).
[57] *López Fantauzzi v. 100% Natural,* 181 DPR 92, 117-118 (2011).
[58] Art. II, Sec. 1, Const. PR, LPRA, Tomo 1.
[59] *Jiménez Soto v. Carolina Catering Corp.*, 2025 TSPR 3, 23 (2025).
[60] *Wackenhut Corp. v. Rodríguez Aponte*, 100 DPR 518, 531 (1972).
[61] 29 LPRA sec. 146.
[62] *Jiménez Soto v. Carolina Catering Corp.*, 2025 TSPR 3, 8 (2025).
[63] *Íd.*
[64] *Íd.,* pág.13.

pudiera persuadir al juzgador de que probablemente hubo una motivación discriminatoria o que la explicación que ofreció el patrono no es creíble[65]. Consecuentemente, el dictamen del foro dependerá de: "(1) la solidez del caso *prima facie* del demandante; (2) el valor probatorio de la evidencia sobre la falsedad de la explicación del patrono, y (3) cualquier otra evidencia que apoye el caso del patrono y que pueda considerarse adecuadamente"[66].

Cónsono con esto, el Tribunal Supremo destacó una decisión del Primer Circuito Federal en la cual se detalló que los "comentarios aislados", aunque puedan ser insensibles o rudos, no son base suficiente para formar una acción discriminatoria[67].

### -F-

La Ley Núm. 80, *supra,* define los actos dirigidos a inducir o forzar a un empleado a renunciar como la única alternativa razonable como una modalidad del despido[68]. Añade que "[n]o basta con cualquier molestia o condición antipática en el empleo, sino que debe tratarse de actuaciones patronales arbitrarias, irrazonables y caprichosas que generen una atmósfera hostil para el empleado [...] que sean originadas por un motivo ajeno al legítimo interés del patrono de salvaguardar el bienestar de la empresa"[69]. Igualmente, impone el deber de demostrar hechos concretos que establecen que los actos del patrono le perjudicaron su condición de empleado[70]. También conocido como despido constructivo o tácito, el Tribunal Supremo explicó que, además de los requisitos de un despido injustificado[71], se requieren:

> (1) acciones de seriedad considerable por parte del patrono, y (2) el empleado no debe tener otra alternativa que no sea la renuncia para resolver la situación adversa que enfrenta en el trabajo, o que aunque el empleado tenga otra alternativa

---

[65] *Íd.,* pág. 14.
[66] *Íd.*
[67] *Íd.,* pág. 17. *Véase González v. El Día, Inc.*, 304 F.3d 63 (1st Cir.2002).
[68] 29 LPRA sec. 185e.
[69] *Íd.*
[70] *Íd.*
[71] *León Torres v. Rivera Lebrón,* 204 DPR 20, 27 (2020).

que no sea la renuncia, el patrono propició una condición de riesgo inminente para la vida o para la salud del empleado[72].

Con relación al ambiente laboral, este "debe tornarse intolerable a tal nivel que la única alternativa razonable para el empleado afectado sea dimitir"[73]. Para que los actos voluntarios e injustificados equivalgan a un despido constructivo es necesario que el empleado promovente demuestre que su única alternativa razonable era el abandono de su cargo[74].

Nuestro Máximo Foro estableció que no se analizaría desde la óptica subjetiva del empleado promovente sino desde un criterio objetivo en tanto y cuanto "una persona razonable se sentiría forzada a renunciar como resultado de las acciones del patrono"[75].

**-G-**

La Ley Núm.115-1991[76], es un estatuto de índole reparador, cuyo principal propósito es proveer protección a los empleados, tanto de las instrumentalidades gubernamentales como del sector privado, frente a determinadas actuaciones ilegítimas por parte de sus patronos[77]. Específicamente, el antedicho precepto prohíbe al patrono despedir, amenazar o discriminar a un empleado, en ocasión a que éste ofrezca, o intente ofrecer, cualquier testimonio, información o expresión, ya sea verbal o escrita, ante un foro administrativo, legislativo o judicial de Puerto Rico[78]. A menos de que se trate de expresiones difamatorias o constitutivas de un secreto de negocio, toda conducta patronal de represalia en contra de sus empleados y fundamentada en un acto protegido por ley, no es avalada por el ordenamiento jurídico.

---

[72] *Figueroa Rivera v. El Telar, Inc.*, 178 DPR 701, 711–712 (2010).
[73] *León Torres v. Rivera Lebrón*, 204 DPR 20, 14 (2020).
[74] *Arthur Young & Co. v. Vega III,* 136 DPR 157, 183 (1994).
[75] *León Torres v. Rivera Lebrón,* 204 DPR 20, 39 (2020); *Rivera Figueroa v. The Fuller Brush Co.*, 180 DPR 894, 908 (2011).
[76] 29 LPRA sec. 194 *et seq.*
[77] *Vázquez Ortiz v. Mun. de Humacao,* 197 DPR 656 (2017); *Cordero Jiménez v. UPR,* 188 DPR 129 (2013); *Feliciano Martes v. Sheraton,* 182 DPR 368 (2011); y la Exposición de Motivos, Ley Núm.115-19991, *supra.*
[78] 29 LPRA 194 a; *Vázquez Ortiz v. Mun. de Humacao, supra; Cordero Jiménez v. UPR, supra.*

Ahora bien, para que un reclamo al amparo del estatuto en cuestión sea eficaz en derecho, la parte promovente está obligada a demostrar su causa de acción y cumplir con una de dos cargas probatorias reconocidas en el ordenamiento jurídico, a saber, la directa o la indirecta. En la directa, el empleado afectado deberá probar su caso mediante *evidencia directa o circunstancial,* con la que demuestre un nexo causal entre la conducta del patrono demandado y el daño sufrido. En la indirecta, el empleado deberá probar un caso *prima facie* de represalia, mediante evidencia que demuestre: 1) que participó en una actividad protegida por la ley y; 2) que subsiguientemente fue despedido, amenazado o discriminado por su patrono[79]. En este contexto, la *proximidad temporal* entre la acción adversa sufrida por el empleado y el ejercicio de la actividad protegida en la que incurrió bastará para cumplir con el *onus probandi* de un caso *prima facie* al amparo del precepto legal aquí en discusión[80]. Una vez lo anterior, compete al patrono alegar y fundamentar una razón legítima y no discriminatoria en la que apoya la legalidad del despido. De cumplir con ello el patrono, entonces el empleado deberá demostrar que la razón alegada por este era un mero pretexto para el despido[81].

**III.**

En el caso ante nuestra consideración, la parte apelante nos solicita la revocación de la *Sentencia* sumaria emitida por el TPI. Previo a iniciar el análisis del señalamiento de error, nos compete consignar si la *Moción de Sentencia Sumaria,* al igual que la *Oposición a Moción de Sentencia Sumaria,* cumplen con los requisitos de forma exigidos por la Regla 36.3 de Procedimiento Civil,

---

[79] 29 LPRA sec. 194a (c); *Vázquez Ortiz v. Mun. de Humacao, supra*; *Rivera Menéndez v. Action Services,* 185 DPR 431 (2012); *supra*; *S.L.G. Rivera Carrasquillo v. A.A.A.,* 177 DPR 341 (2009).
[80] *Rivera Menéndez v. Action Services, supra; Feliciano Martes v. Sheraton, supra; Marín v. Fastening,* 142 DPR 499 (1997).
[81] 29 LPRA sec. 194a(c).

*supra.* Ello, recordamos, es un requisito de umbral a la revisión de una sentencia dictada sumariamente.

Como indicamos, relativo a nuestra facultad revisora sobre la procedencia de la sentencia sumaria, únicamente podemos determinar la existencia de una controversia genuina de hechos materiales y esenciales, y si el derecho se aplicó correctamente.

Tras un análisis de la *Moción de Sentencia Sumaria* presentada por T-Mobile, determinamos que esta cumple cabalmente con la Regla 36.3 de Procedimiento Civil, *supra.* En la misma, se hizo una relación clara y concisa de los hechos que no estaban en controversia y hacían referencia a la prueba documental que los sustenta.

En cuanto a la *Oposición a Moción de Sentencia Sumaria* presentada por la señora Petrocelli, concluimos que esta no cumplió con los requisitos estatuidos en la Regla 36(c) de Procedimiento Civil, *supra.* Adelantamos que levantó argumentos inconsecuentes y tardíos para intentar evitar la desestimación sumaria de sus reclamaciones. La referida regla y la jurisprudencia han sido enfáticas en que la oposición debe hacer referencia de forma detallada y específica sobre los hechos que desea impugnar. Es por ello que, resulta imperativo que la parte opositora presente su prueba y no descanse meramente en las alegaciones ya presentadas[82], lo cual no hizo la parte apelante, en el caso de autos.

Referente al error señalado por la señora Petrocelli encontramos que, aun cuando se alega un solo error, este se subdivide en dos argumentaciones legales. Fíjese que, gran parte del petitorio de la *Oposición a Moción de Sentencia Sumaria* giró en torno a que se deben dar por admitidos los párrafos 15 al 26, 28 al 30, 33 al 34, 41 al 42, 47, 49, 58, 61, 63, 67 al 68, 70, 72, 79 y 87 de la

---

[82] *Oriental Bank v. Perapi,* 192 DPR 7, 26 (2014); *Sánchez Montalvo v. Aut. de los Puertos,* 153 DPR 559, 570 (2001).

*Demanda Enmendada*, en virtud que, alegadamente T-Mobile negó inadecuadamente esos párrafos al apartarse de la Regla 6.2 de Procedimiento Civil, *supra.*

Así las cosas, la apelante arguyó que incidió el foro primario al no considerar como admitidos los hechos de la *Demanda Enmendada* porque no se negaron conforme a la Regla 6.2 de Procedimiento Civil, *supra.* Resolvemos en la negativa. Dicho argumento se presentó de manera tardía. Veamos.

La *Contestación a Demanda Enmendada* se presentó el 16 de septiembre de 2022, mientras que, el argumento de incumplimiento con las formas de negar se levantó por primera vez el 21 de abril de 2024, en la *Oposición a Moción de Sentencia Sumaria*. Entiéndase, aproximadamente un (1) año y siete (7) meses más tarde. Lo cierto es que, para el 31 de enero de 2024, el TPI había decretado el cierre del descubrimiento de prueba, según surge de la *Minuta*[83] y la parte apelante no consignó dicho reclamo en el momento oportuno. Además, concurrimos con el foro apelado al revisitar la *Contestación de la Demanda Enmendada*, de la cual se desprende claramente que T-Mobile atendió cada una de las alegaciones de la parte apelante en su *Demanda Enmendada*, además, presentó defensas afirmativas. En consecuencia, este error no fue cometido.

Como parte del único error, la señora Petrocelli también adujo que el TPI erró al descartar su testimonio incontrovertido en su deposición.

Tras examinar la transcripción de la prueba oral y la *Oposición a Moción de Sentencia Sumaria*, surge que no controvirtió ninguno de los hechos esenciales propuestos por T-Mobile ni sometió, de la manera adecuada y requerida, hechos adicionales para apoyar sus

---

[83] Entrada Núm. 18 del Sistema Unificado de Manejo y Administración de Casos (SUMAC).

argumentos y alegaciones en oposición[84]. La parte apelante se limitó a descansar únicamente en las alegaciones de su *Demanda Enmendada* y alegó que existen cuarenta y ocho (48) hechos que, a su entender, están en controversia, así como trece (13) hechos incontrovertidos, fundamentados en su deposición.

Aun cuando el ordenamiento jurídico requiere que al presentar la *Oposición a Moción de Sentencia Sumaria* se deben controvertir los hechos esenciales propuestos por la otra parte, lo cual no hizo la parte apelante, esto no equivale a la concesión automática del remedio solicitado. **Ello, debido a que la concesión de la sentencia sumaria tiene que proceder conforme al derecho sustantivo aplicable**[85]. En armonía con el examen de *novo* y en cumplimiento con nuestra función revisora, procedimos a revisar la totalidad del expediente ante nos. Encontramos que, la *Sentencia* apelada cumple con los requisitos de formas, y fue dictada conforme a derecho. Acogemos las determinaciones de hechos del foro apelado y las hacemos formar parte de esta Sentencia.

Nótese que, para alegar un despido injustificado por razón de discrimen el promovente debe demostrar: "(1) que hubo un despido o acto perjudicial; (2) que la acción del patrono fue injustificada, y (3) **algún hecho que lo ubique dentro de la modalidad de discrimen bajo la cual se reclama**"[86]. Para derrotar la presunción de un despido injustificado el patrono puede "presentar prueba que derrote el hecho básico; esto es, que el despido fue justificado; o destruir el hecho presumido (que el despido no fue discriminatorio); o presentar prueba para atacar ambos hechos"[87].

---

[84] *SLG Zapata-Rivera v. J. F. Montalvo,* 189 DPR 414, 432 (2013).
[85] *Meléndez González v M Cuebas,* 193 DPR 100 (2015).
[86] *Belk v. Martínez,*146 DPR 215 (1998), *Hernández v Trans Oceanic Life Ins.* Co 151 DPR 754 (2000) y *López Fantauzzi v 100% Natural* 181 DPR 92 (2011) (Énfasis nuestro).
[87] *Ramírez Ferrer v. Conagra Foods PR,* 175 DPR 799, 815 (2009).

Al analizar el primer elemento, la parte apelante alegó que T-Mobile la despidió de manera constructiva. Según la Ley Núm. 80, *supra, el despido constructivo son los actos dirigidos a inducir o forzar a un empleado a renunciar como única alternativa razonable*[88]. Sin embargo, no puede ser cualquier molestia o condición antipática, deben ser acciones arbitrarias e irrazonables que sean ajenos al interés de salvaguardar la empresa[89]. El empleado debe evidenciar que la única alternativa razonable era el abandono de su cargo[90].

De un análisis de los autos se desprende que, la señora Petrocelli desde el inicio de la relación laboral con T-Mobile conoce que la parte apelada podía realizar cambios de horarios y de localidad, como respuesta a las necesidades de la compañía. Según surge del expediente, durante su tiempo empleada en T-Mobile, la parte apelante solicitó varios ajustes de horarios por distintas razones. Su último ajuste fue el siguiente: culminar su jornada laboral a las 4:30pm los lunes, martes, jueves y viernes; dos (2) sábados alternos al mes libres; y disponibilidad de trabajar tres (3) domingos al mes. En su última petición de ajustes, requirió un tercer sábado al mes libre, pero se le denegó, debido a la necesidad de la sucursal. Sin embargo, Millery Sifre, Human Resources Partner (señora Sifre), y Julio Cortés, supervisor (señor Cortés), estaban en la mejor disposición de poder ayudar a la parte apelante en la medida que la operación de la sucursal lo permitiera. Al no poder tener los tres sábados libres al mes, la señora Petrocelli solicitó el cambio de localidad. La señora Sifre le notificó que debería solicitar nuevamente el cambio de sucursal con el señor Edwin Feliciano, Disctrict Manager. No obstante, surgió que la señora Petrocelli no discutió con el señor Feliciano el asunto del traslado. A

---

[88] 29 LPRA sec. 185e.
[89] *Íd.*
[90] *Arthur Young & Co. v. Vega III,* 136 DPR 157, 183 (1994).

pesar de tener solamente dos sábados libres al mes, la señora Petrocelli optó por ausentarse a su trabajo el tercer sábado. Así las cosas, la apelante presentó su carta de renuncia porque no se le permitió el cambio solicitado. A tenor con lo anterior, de la prueba presentada no surgió que la señora Petrocelli estableciera que la renuncia era la única alternativa razonable. En todas las ocasiones anteriores se le concedieron los ajustes presentados. Inclusive, en su última solicitud, los patronos intentaron reajustarla conforme a las necesidades de la sucursal. Por lo que, concluimos que no se configuró el primer elemento que tiene que probar la parte apelante para activar la presunción de discrimen.

El próximo requisito requiere que la parte promovente aduzca un hecho que lo ubique dentro de la modalidad de discrimen que reclama. De los argumentos esbozados por la parte apelante, alegó que fue discriminada por razón de su embarazo. Según discutimos, el despido por razón de embarazo es una modalidad del discrimen por razón de sexo[91]. Para la aplicación de esta presunción, resulta imperativo que el despido haya ocurrido mientras la empleada se encontraba embarazada. Durante su embarazo, la señora Petrocelli se mantuvo con su mismo salario, mismos beneficios, horarios y turnos acordados. Por otro lado, de los autos surgió que la parte apelante tuvo a su bebé el 13 de julio de 2021[92], disfrutó su licencia de maternidad y esta presentó su carta de renuncia el 8 de julio de 2022, con fecha de efectividad el 12 de julio de 2022. Por lo que no le asiente la razón en el término de discrimen por razón de embarazo. Sobre la alegación del discrimen por origen nacional, únicamente surge una instancia en la que el señor Cortés realizó un comentario sobre los venezolanos[93]. El Tribunal Supremo resolvió

---

[91] *Rivera Águila v. K-Mart de PR*, 123 DPR 599, 608 (1942).
[92] Apéndice del recurso de *Apelación*, pág. 62.
[93] El señor Cortés le comentó que le habían dicho que los venezolanos de mucho dinero maltrataban a los empleados.

que un comentario aislado no es suficiente para poder formular una acción de origen discriminatorio[94]. Por lo que no estamos ante un escenario de discrimen por nacionalidad.

Por último, descartamos la alegación de que la parte apelada tomó represalias por esta haber reclamado sus derechos. La Ley Núm. 115-1991, establece como requisito de umbral que el empleado pruebe que su patrono toma medidas adversas contra él por haber participado en actividades protegidas, como ofrecer testimonio ante un foro judicial o administrativo, o por haberse opuesto a prácticas ilegales. Sin embargo, el expediente se encuentra huérfano de evidencia que sustente dicha alegación.

Ante este escenario, colegimos que el error imputado al TPI no fue cometido y corresponde confirmar la *Sentencia* apelada.

**IV.**

Por los fundamentos que anteceden, los que hacemos formar parte de este dictamen, ***confirmamos*** la *Sentencia* apelada.

Notifíquese.

Lo acordó y manda el Tribunal, y lo certifica la Secretaria del Tribunal de Apelaciones.


Lcda. Lilia M. Oquendo Solís
Secretaria del Tribunal de Apelaciones

---

[94] *Jiménez Soto v. Carolina Catering Corp.*, 2025 TSPR 3, 17 (2025).